SAMUEL N. BACON, Respondent, v. THE UNITED STATES MUTUAL ACCIDENT ASSOCIATION of the City of New York, Appellant.

In an action upon an accident insurance policy or certificate which provided that it should not extend " to any death or disability, which may have been caused wholly or in part by bodily infirmities or disease * * * nor to any case except where the injury is the proximate or sole cause of the disability or death, it appeared that the death of the insured, was caused by a malignant pustule; this, plaintiff's witness testified in substance, is caused by contact with putrid or diseased animal matter; that it is an acute, infectious malady, sometimes epidemic, differing from diphtheria, small-pox, scarlet fever and other like diseases, in the single fact that it is a poisonous animal matter, the special poison being a particular kind of bacteria, and the forming of the pustule the product of the poison; that it is a pathological condition caused by the infliction of this particular kind of poison. *Held* (RUGER, Ch. J. and O'BRIEN, J., dissenting), that the insured died from disease within the meaning of the policy, and so, plaintiff was not entitled to recover. *Paul* v. *T. Ins. Co.* (112 N. Y. 472), distinguished.

(Argued June 24, 1890; decided October 14, 1890.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, entered upon an order made November 20, 1888, which affirmed a judgment in favor of plaintiff entered upon a verdict and affirmed an order denying a motion for a new trial.

This was an action upon an accident policy or certificate of insurance issued by the defendant.

The defendant is a corporation organized under the laws of this state for the purpose of carrying on the business of accidental or casualty insurance on the co-operative or assessment plan. On the 28th of September, 1883, Frederick J. Oaks, then a resident of the state of Massachusetts, made application for membership in the association, which was accepted on that day, the applicant at the same time paying the necessary fee. From an inspection of the application as it appears in the record it is evident that it was a printed blank prepared by the association and furnished to the applicant. It contemplates and provides for the issuing by the association and delivery to Mary J. Oaks, the mother of the applicant, of a certificate of membership in due form expressing the contract between the parties. The mother was designated as the beneficiary to whom the sum stipulated was to be paid in case the applicant died by accident within the terms of the application and certificate. The association issued and delivered the certificate to the mother whereby it agreed in consideration of the warranties and agreements made in the application for membership, to accept the applicant as a member of the association, subject to all the requirements and entitled to all the benefits thereof. This paper contains the substance of an ordinary contract of insurance upon the life of a person, and stipulates that a sum, not to exceed $5,000, to be raised by assessment upon the members, as provided for in the by-laws of the association should be paid to the mother of the said Oaks "within sixty days after sufficient proof that said member at any time within the continuance of membership, shall have sustained bodily injuries, effected through external, violent and accidental means within the intent and meaning of the by-laws of the association and the conditions hereunto annexed, and such injuries alone shall have occasioned death within ninety days from the happening thereof, or, if said member shall sustain bodily injuries by means aforesaid, which shall, independently of all other causes, immediately

and wholly disable and prevent him from the prosecution of any and every kind of business pertaining to the occupation under which he receives membership, then upon satisfactory proof of such injuries he shall be indemnified against loss of time thereby in a sum not to exceed $25 per week for such period of continuous total disability, etc." It was also stipulated that "benefits under this certificate shall not extend * * * to any bodily injury of which there shall be no external and visible sign, nor to any bodily injury happening directly or indirectly in consequence of disease; nor to any death or disability which may be caused wholly or in part by bodily infirmities or disease existing prior or subsequent to the date of this certificate, or by poison in any manner or form, * * * nor to any case, except where the injury is the proximate or sole cause of the disability or death." In the application, the applicant states that he was aware that the benefits secured by the certificate "will not extend * * * to death or disability caused wholly or in part * * * by taking poison in any form or manner."

The insured died at Council Bluffs, in the state of Iowa, on the 21st day of March, 1884. His mother, the beneficiary named in the certificate, survived him and assigned the certificate and cause of action to the plaintiff.

Further facts appear in the opinion.

*Winsor B. French* and *William Bro. Smith* for appellant. The contract in this case is a contract of indemnity under which the liability of the insurer is confined to death or disability caused by bodily injuries, effected through external, violent and accidental means, and of which injuries there shall be exterior and visible signs. If fatal, such injuries alone must cause the death, and within ninety days. It excludes injuries resulting from constitutional infirmities and disease in any form. If death is caused by disease as distinguished from accident there can be no recovery. (*Paul* v. *T. Ins. Co.*, 112 N. Y. 478; *Bacon* v. *U. S. M. A. A.*, 44 Hun, 599; *Southard* v. *R. P. A. Co.*, 34 Conn. 574; *McCarthy* v. *T.*

*Ins. Co.*, 8 Ins. L. J. 208 ; *Whitehouse* v. *T. Ins. Co.*, 7 id. 23 ; *Barry* v. *U. S. M. A. A.*, 14 id. 603 ; *Pollock* v. *U. S. M. A. A.*, 12 id. 319, 730 ; 102 Penn. St. 230.) If the death was occasioned by one of two causes, for one of which defendant is responsible and for the other of which it is not, the plaintiff must fail if his evidence does not show that it was produced by the former cause; and he must fail also if it is just as probable that it was caused by one as by the other, as the plaintiff is bound to make out his case by the preponderance of evidence. (*Searle* v. *M. R. R. Co.*, 101 N. Y. 661.) If the death was caused by malignant pustule, it was caused by poison and appellant is not liable. (*Pollock* v. *U. S. M. A. A.*, 12 Ins. L. J. 319, 730 ; *Hill* v. *H. A. Ins. Co.*, 22 Hun, 187 ; *Bayliss* v. *T. Ins. Co.*, 14 Blatch. 143.) The respondent's assignor, having failed to comply with the condition in the contract precedent to a recovery concerning preliminary proofs, should have been nonsuited at the trial. (*O'Reilly* v. *G. M. L. Ins. Co.*, 60 N. Y. 169 ; Bliss on L. Ins. [2d ed.] 434.)

*Richard L. Hand* for appellant. The verdict cannot be sustained as it is based upon mere conjecture and sheer speculation. (*Searles* v. *M., etc., R. R. Co.*, 101 N. Y. 661 ; *Taylor* v. *Yonkers*, 105 id. 202.)

*George L. Stedman* for respondent. The assured came to his death through sustaining bodily injuries effected through external violent and accidental means, within the intent of the assurance. (*Reynolds* v. *A. Ins. Co.*, 18 Wkly. Rep. 114 ; *McClenchy* v. *F. & C. Ins. Co.*, 80 Me. 251 ; *N. A. L. & A. Ins. Co.* v. *Burroughs*, 69 Penn. St. 43 ; *Hill* v. *H. Ins. Co.*, 22 Hun, 187 ; *Paul* v. *T. Ins. Co.*, 112 N. Y. 472 ; *Mallory* v. *T. Ins. Co.*, 47 id. 52 ; *Southard* v. *R. P. Ass. Co.*, 34 Conn. 574 ; *Trew* v. *T. P. R. Assn.*, 6 H. & N. 839 ; *U. S. M. A. Assn.* v. *Barry*, 131 U. S. 100, 121.) The proof of the external, violent and accidental injuries, producing death within ninety days, is sufficient to warrant and uphold the finding for the plaintiff, and also sufficient to answer the demands of the policy. (*Hart* v. *H. R. B. Co.*, 80 N. Y. 622 ;

*Justin* v. *Lang*, 52 id. 323; *Paul* v. *T. Ins. Co.*, 112 id. 472.)
The assured did not die from the taking of poison in any form
or manner. (*Foot* v. *E. L. Ins. Co.*, 61 N. Y. 571; *Cushman*
v. *U. S. L. Ins. Co.*, 63 id. 404; *Kratzenstein* v. *W. Ass. Co.*,
116 id. 54; *Allen* v. *S. L. Ins. Co.*, 85 id. 473; *Hoffman* v.
*Æ. F. Ins. Co.*, 32 id. 405; *Dilsber* v. *H. L. Ins. Co.*, 69
id. 257, 263; *Hill* v. *H. A. Ins. Co.*, 22 Hun, 187.) The
main object of the insurance was to insure the life of the
deceased in case of accident, and all provisions or conditions
must be strictly construed against the defendant, who wrote
the instrument and made the provisions. (*Paul* v. *T. Ins. Co.*,
112 N. Y. 479.) The proofs of death are sufficient within the
terms of the policy and in fact. (*Goldschmidt* v. *M. Ins. Co.*,
2 N. Y. S. R. 421; *K. L. Ins. Co.* v. *Schneider*, 100 U. S. 694.)

Peckham, J. I think the deceased died from disease within
the meaning of the language used in the policy sued upon in
this action, and not from an accident causing the disease. The
disease itself was not caused by an accident within the meaning
of the policy.

The case of *Paul* v. *Travelers' Ins. Co.* (112 N. Y. 472) has
been cited by counsel for the respondent as decisive of his case.
Upon the question decided the case is conclusive, and we have no
disposition to alter our views as expressed therein. But upon
the question of whether the deceased in this case died from dis-
ease, as above stated, the case of Paul is without the slightest
analogy. In that case the deceased came to his death by acci-
dentally inhaling illuminating gas. This gas is a manufactured
article, gathered into large reservoirs, and thence distributed
through pipes into almost every house in a city or village.
The deceased accidentally while asleep inhaled this gas and
was suffocated. This would seem to be a plain case of death
from accident, and it was found that the gas was not purposely
inhaled. The death being the result of accident it was then
held that such death was caused by external and violent means
within the meaning of the policy. This also seems plain
enough. The gas was external, and it was not inhaled volun-

tarily, *i. e.*, intentionally and for the purpose of being killed
thereby. It might naturally be said, as in effect it was, that
death, as the result of accident, imports an external and violent
agency as the cause. There was no question in the *Paul* case
that the deceased came to his death through disease; no pre-
tence could properly be made as to death from disease in such
a case. If the deceased had been asleep in a room into which
a large quantity of water was poured through the accidental
breaking of a water-main, and in consequence thereof he had
been drowned, no one would deny that the death was caused
by accident and was not the result of disease, as that word is
generally used among men. There is no difference in the case
in principle if the death instead of being caused by water
which was visible, was caused by gas which is invisible. In
neither case would the idea even suggest itself that death was
caused by disease. But in the case before us the facts are
entirely different.

The deceased died, as is said and as will be here conceded,
from malignant pustule. It is caused, as the plaintiff's witness
testified, by the infliction upon the body of a certain kind of
animal substance, contact with diseased or putrid animal mat-
ter; this acts by producing, at the point of contact with this
matter, a papula, something like a flea bite, which rapidly
becomes a vesicle, a blister-like affair, and then a pustule;
this is accompanied by a great deal of swelling in the parts
immediately around it, and a great deal of pain in the indi-
vidual; the glands in the vicinity become infiltrated with
blood and pus, and become dark red or even black in color;
the neighboring glands become involved; then comes, almost
immediately after or together with these signs, a great prostra-
tion, and the patient dies in a short time, five to eight days
generally, the extreme limits being from twenty-four hours to
sixteen days; he dies of exhaustion.

As to the cause of the pustule, the witness stated that the
virus comes from the hide, or hair, or wool of animals suffer-
ing from this disease; from their flesh sometimes, or it may
come from the feathers of birds that have been feeding upon

this peculiar kind of carrion; it may be communicated directly, that is, by the immediate contact of the individual with it; by his touching it or handling it and then bringing the matter in contact with the skin or thin mucous membrane; or it may be transported, as there are very many cases known, by insects, flies, mosquitos, that have been feeding upon this, carrying it away and depositing it upon individuals. It is commonly known as malignant pustule, or charbon, or anthrax; they are all synonymous terms. It has been called wool-sorter's disease, because it happens among people that handle wools and hides, such as tanners, butchers and herdsmen, and those people that are engaged in business where they are brought in contact with that sort of thing.

In answer to the question, "How rare is malignant pustule?" this same witness for the plaintiff answered: "In the eastern parts of this country, it is pretty rare; there have been some epidemics reported in America; in the eastern part of Massachusetts, I think about twenty years ago, there were quite a number of cases among the hairworkers, people that take the hair that comes from abroad and make mattresses of it."

The witness thus designates the difficulty as an epidemic, which word is so frequently used in connection with disease as almost to be synonymous therewith. It was undoubtedly so used in this instance by the witness, who thus describes malignant pustule as a disease, when referring to its frequency in Massachusetts some years ago. The word epidemic would scarcely be used to express a frequent occurrence of accidents. The witness also said that he has seen it termed in one standard authority as an acute infectious disease. He said that the special poison of the disease has been found to be a particular kind of bacteria, "bacillus-anthrax." The following question was put to the witness: "Is it not so, that anthrax is an acute, infectious malady, which breaks out commonly in an epizootic or enzootic manner, and is not infrequently sporadic in herbivorous animals and swine, and is transmissible to a great number of other animals, as well as to mankind." The answer of the witness, after some fencing, was, "Yes, I think that is correct."

Malignant pustule differs, according to this same witness, from diphtheria, small-pox, or scarlet fever, in the single fact that this is a particularly poisonous animal matter, and it has one particular germ from which it originates, as small-pox has another, and hydrophobia another, and the cause of the difficulty in each case is some form of bacteria, transmissible to mankind. It can be contracted through eating the flesh of animals subject to the disease. The bacillus is very small, so small that it may enter in the pores of the skin, and an abrasion of the skin is not necessary, but might quicken the result. The forming of the pustule upon the skin is the product of the poison.

Another witness for the plaintiff, who was a physician, said that he understood malignant pustule to be a development of the particular bacilli in the system radiating from the point of contact. He added that the contagion might be internal as well as external, taken through the mouth or through the nose, and it is generally considered an acute infectious disease.

Both these learned gentlemen, however, refused, themselves, to designate malignant pustule as a disease.

Doctor Harris defined it as "a pathological condition and succumbing of the body to the infliction of this particular poison." Doctor Bailey says he considers it as a "pathological condition following this particular inroad of this particular kind of bacilli."

We all know that "pathology," as used generally, means that part of medicine which explains the nature of diseases, their causes and symptoms. A "pathological condition" means neither more nor less than a diseased condition of the body. The insurance in this case was against bodily injuries effected through external, violent and accidental means. It was not to extend "to any death or disability which may have been caused wholly or in part by bodily infirmities, or disease existing prior or subsequent to the date" of the policy, "nor to any case except where the injury is the proximate or sole cause of the disability or death." There cannot be the slightest doubt that malignant pustule is regarded generally, by those who have but the usual acquaintance with such matters, as a

disease. Every particle of testimony given by the doctors called by the plaintiff, shows clearly to my mind that it is so regarded generally in the medical world, and that it is only when these doctors are asked to define the case in a manner to suit their refined notions of scientific and artistic accuracy, that they define the trouble as a "pathological condition of the body" in the one case, "succumbing to infliction cf this particular poison," and in the other, "following this particular inroad of this particular kind of bacilli."

The difference between the cause of this condition and the causes of typhoid fever, tuberculosis, small-pox, scarlet fever and such like diseases, is that this particular condition is caused by different bacilli from the others, and they come in contact with the skin or enter into its pores, while in the other cases they are generally breathed in.

But no abrasion of the skin is needed to produce the contact of the bacilli, and what follows from such contact seems to be as plainly a disease as in the case of small-pox or typhoid fever. The question then is, even assuming that some particular physicians refuse to call this a disease and describe it as a pathological condition, whether it is not a disease within the meaning of that term as used in this policy? Taking all the facts testified to by these physicians of the plaintiff, including their own special description of this condition of the body, and it seems to me there can be no intelligent, rational doubt that the insured died from a disease attacking him subsequent to the issuing of the policy. He did not die from any accident within the provision contained in the policy defining an accident. The definition given by the physicians for the plaintiff as to the difficulty being a pathological condition of the body and not a disease, is upon these facts entirely too fragile to base a recovery upon, and the distinction between a disease and a pathological condition of the body is, with reference to this case, much too refined for common acceptance. It seems to me clear that the meaning of the words used in the policy cover just such a case, and that the parties never intended that a cause of death, which to all outward appearances, and to the world in general, was a

disease, should be converted into a "pathological condition" of the body caused by an accident.

The judgment should be reversed and a new trial ordered, costs to abide event.

O'BRIEN, J. (dissenting). The principal, if not the only, question in this case is whether the death of the insured was the result of accident, within the meaning of the words used in the contract, or of disease or other cause not covered by the stipulations of the parties. There is no dispute as to the fact that death resulted from the effects of a malignant sore upon the lip of the insured, which, soon after its appearance, involved the neighboring parts, producing septicemia and utter exhaustion. There were two theories as to what this local sore was. On the part of the plaintiff, it was claimed that it was what is known as malignant pustule, while the defendant sought to establish the fact that it was a facial carbuncle and, therefore, a disease, or the result of disease, within the terms or meaning of the contract. The court instructed the jury that if the sore was, in fact, a carbuncle, that the plaintiff could not recover, but that if it was a malignant pustule produced upon the person of the deceased in the manner claimed by the plaintiff, that then the plaintiff was entitled to a verdict.

The testimony of the medical experts produced by the plaintiff was to the effect that this pustule is not a disease in the strict sense of that term, but a pathological condition of the system caused by the accidental infliction of diseased or putrid animal matter, infested with bacteria or bacilli anthrax, upon the thin skin of the lip whence the bacilli multiply and are diffused through the system. The animal virus that produces the sore comes from the hides, hair, wool or flesh of animals suffering from the disease known as anthrax, and may be transmitted to human beings directly by the immediate contact of the individual with it, by his touching or handling it, and then bringing the matter in contact with the skin or thin mucous membrane, or it may be carried by carrion birds, or by

insects, and in various other ways communicated to man and inflicted or implanted upon some exposed portion of the body. People whose business requires them to handle hides, hair or wool, and who live in cattle grazing regions, or localities such as the southern or western portions of the United States, are, according to the proofs in this case, more exposed to malignant pustule than persons in other vocations, or who live in localities where cattle do not abound.

The insured went to Council Bluffs on the 1st of February, 1884, and, as has been stated, died there in less than two months after. He was first employed as a bookkeeper in a meat market, and later as a check clerk in the transfer department of the Union Pacific Railroad. It was shown that carloads of hides frequently pass that station, and that a large number of cattle are brought there and slaughtered in the vicinity, but there was no direct or positive proof that the deceased ever came in immediate contact with the hides, or even the flesh of these animals.

We must accept the verdict of the jury that the deceased died from the effects of malignant pustule. Whatever an appellate court may think of the weight and force of the evidence submitted at the trial it cannot, when there is some evidence, ignore or disregard the deliberate judgment of the body which, under our system of administering justice, is empowered and required to determine disputed questions of fact. There was evidence to warrant the finding, and in such a case, after review by the General Term, this court must deal with the case upon the principle that death was caused as claimed by the plaintiff.

Whether the malignant pustule of which the insured died was the result of animal virus coming in contact with the lip, or whether the sore was produced in some other way, was, perhaps, a more difficult question; but in view of the testimony of the plaintiff tending to show that the infliction of this virus upon the person is the only cause of pustule, and that the insured was in some degree exposed to it, and that death generally follows contact with it in a few days, we think it

cannot be said that this finding is based wholly on speculation and conjecture. It was the province of the jury to draw all proper inferences from the testimony, and while there was no direct or positive proof as to when or how the animal virus came in contact with the person of the deceased, yet the jury was warranted in finding from the other testimony in the case that in some way the bacilli anthrax were implanted upon the lip where the sore appeared, and at some time within ninety days prior to the death of the insured. Assuming that death was the result of malignant pustule, caused in the manner claimed by the medical experts who testified in behalf of the plaintiff, the question remains whether this was "*external, violent and accidental means,*" within the intent and meaning of the contract. This court has held that where death results from breathing an atmosphere impregnated with illuminating gas which in some way escaped from pipes while the insured was asleep, the beneficiary was entitled to recover under a policy containing those words. (*Paul* v. *T. Ins. Co.*, 112 N. Y. 472.) Death by drowning is included in such a contract. (*Trew* v. *R. P. Assn.*, 6 H. & N. 839; *Mallory* v. *T. Ins. Co.*, 47 N. Y. 53.) So is death which may have been produced by fright. (*McGlinchey* v. *F. & C. Co.*, 80 Me. 251.)

Without attempting to collate all the cases on this point, it is sufficient to observe that the courts, both in this country and in England, have given to these words a broad and liberal interpretation in favor of the insured or the beneficiary designated in the policy. (*U. S. M. A. Assn.* v. *Barry*, 131 U. S. 100, 121; *N. A. L. & A. Ins. Co.* v. *Burroughs*, 69 Penn. St. 43; *A. Ins. Co.* v. *Crandal*, 120 U. S. 527; *Winspear* v. *A. Ins. Co.*, L. R. [6 Q. B. Div.] 42; *Paul* v. *T. Ins. Co., supra.*) Guided by the principles laid down in these and other cases, and by what seems to me to have been the intention of the parties, I am of the opinion that we should hold in this case that the infliction of animal virus by some exterior force or power upon the person of the deceased, as found by the jury, was a bodily injury, "affected through external, violent and accidental means," producing death, within the intent and mean-

ing of the policy and that the defendant is liable. When death results from the accidental infliction of the animal virus upon the person, whether by handling the same, or deposited upon his person by insects or otherwise as shown by the witnesses for the plaintiff, it cannot, I think, be said that the jury was bound to find that the malignant pustule was a disease within the conditions of the policy exempting the defendant from liability. The jury could have found in view of the evidence that the deceased lived in a locality and was engaged in employments in which he was exposed to contact with this peculiar form of poison, and it seems to me that a malignant pustule produced by the deposit upon the lip of the deceased of a particle of this animal virus resulting in death, is as much an accident as in the case of death from breathing illuminating gas while asleep. There was evidence upon which the jury could have found that the deceased contracted the pustule in this way.

For these reasons I am constrained to dissent from the prevailing opinion in this case, and am in favor of affirming the judgment.

All concur with PECKHAM, J., except RUGER, Ch. J., and O'BRIEN, J., dissenting.

Judgment reversed.