JOHNSON *v.* FIDELITY & CASUALTY CO. OF NEW YORK.

1. INSURANCE — HEALTH AND ACCIDENT POLICY — LIMITATION OF ACTION—STATUTES.

Where a policy of accident insurance contained the proviso that if any limitation in the policy should be prohibited by statutes of the State in which the policy was issued the limitation should be considered as amended so as to conform to the minimum period of limitation permitted by the statutes, and where under the statutes of the State of Illinois in which the policy was issued it was prohibited to insert in any life insurance policy a provision limiting the time within which action might be commenced to less than three years from the date that the action accrued, the policy must be *held* to have been affected by the provisions of the statute and plaintiff's right of action was not restricted to the period of six months after the date named for filing the final proofs of death, as fixed by the language of the policy.[1]

[1] As to when limitation of time for suit on insurance policy begins to run, see notes in 47 L. R. A. 704 and 48 L. R. A. (N. S.) 908.

2. SAME—ACCIDENT INSURANCE.

Under a policy of insurance against death by external or violent and accidental means, the rules applicable to the rights of the insured are the same as in case of life insurance; the mere addition of one or more features or limitations in a contract of insurance that may serve to give the policy a peculiar designation, in the business and insurance world, will not have the effect of divesting it of its character as insurance upon life.

3. WITNESSES—PRIVILEGE—PHYSICIANS AND SURGEONS—WAIVER—INSURANCE—RIGHT OF BENEFICIARY.

A physician of the insured, who is offered as a witness in behalf of the beneficiary, is not precluded on the ground that his testimony is privileged, from giving testimony concerning facts relating to the cause of death, which he may have discovered from the existence of the confidential relation of physician and patient: the beneficiary is entitled to waive the privilege.[1]

4. EVIDENCE—INSURANCE—REPORT—REBUTTAL.

It was competent, in an action on an insurance policy, for the plaintiff, in rebuttal, to show what occurred at an interview between the examining physician and the deceased, in the presence of herself and others, where said physician testified in behalf of defendant, and his report of an examination of deceased was allowed in evidence as also a letter, written by the defendant company to the plaintiff, following said report, in which it was stated that her physician and defendant's physician both advised the writer that deceased was affected by tuberculosis: nor did the court err in receiving in evidence the statement made by insured to his physician relating to the cause of his illness which plaintiff claimed was ptomaine poisoning.

5. INSURANCE—ACCIDENT INSURANCE—PREMIUMS—NON-PAYMENT—BREACH OF CONTRACT.

Where decedent was insured in the month of September and it was provided by the contract that the first payment of premium should be made on the 15th of November out of wages in the hands of his employers, that the premium was not paid but the insured left his employment before November 15th and the wages due were retained by the employer, the insured dying on November 21st, the policy did not terminate for failure to make the payment in time.

---

[1] For waiver by beneficiary of privilege as to communications between physician and patient, see note in 48 L. R. A. (N. S.) 418.

6. SAME—ACCIDENTAL DEATH—PTOMAINE POISONING.

Under a policy of accident insurance the beneficiary was entitled to recover for death of the insured by reason of his taking tainted food resulting in ptomaine poisoning and death, where there was a conflict of evidence whether decedent had tuberculosis or not and what was the immediate cause of his decease, the trial court correctly submitted the question to the jury as one of fact.[1]

Error to St. Clair; Law, J. Submitted November 10, 1914. (Docket No. 154.) Decided March 17, 1915. Rehearing denied July 23, 1915.

Assumpsit by Catherine Johnson against the Fidelity & Casualty Company of New York upon a policy of accident insurance. Judgment for plaintiff. Defendant brings error. Affirmed.

*Phillips & Jenks* (*Edwin A. Jones,* of counsel), for appellant.

*John B. McIlwain,* for appellee.

MOORE, J. Suit was brought February 3, 1913, on a policy of insurance, which provides for the payment of $3,000 in case the assured comes to his death as the result of an accident. The policy was issued September 15, 1911, and the assured died November 21, 1911. The plaintiff is the mother and beneficiary named in the policy. It is the claim of the plaintiff that the proximate cause of the death was ptomaine poisoning, and that this is an accidental death within the meaning of the policy. The defenses urged will appear later. The case was tried before a jury, which returned a verdict for the plaintiff. A motion was made for a new trial, which motion was overruled, the trial judge stating at length his reasons for doing so. From a judgment for $3,346.25 in favor of the plaintiff, the case is brought here by writ of error.

The first group of assignments of error relates to

---

[1] On the question as to what constitutes an accident within an accident policy, see note in 30 L. R. A. 206.

the claim that the suit was not brought within the time limited by the policy, as article 3 of the policy provides that legal proceedings shall not be brought at all unless begun within 6 months from the date specified therein for final proofs, and it is said the suit should have been brought within 8 months from the time of death, while in fact more than 14 months elapsed. It is contended by plaintiff that this limitation is controlled by another provision of the policy and a statute of Illinois, in which State the policy was written and delivered. The policy provision is in article 3, and is as follows:

"If any limitation set forth in this and the preceding article is prohibited by the statutes of the State in which this policy is issued, the said limitation shall be considered to be amended to agree with the minimum period of limitation permitted by such statutes."

The Illinois statute relied upon by the plaintiff is Senate Bill No. 388, approved May 20, 1907 (Laws of Illinois 1907, page 367). Section 2 of the act provides:

"No policy of life insurance shall be issued or delivered in this State * * * if it contain any of the following provisions: (1) A provision limiting the time within which any action at law or in equity may be commenced to less than three years after the cause of action shall accrue."

It is claimed by defendant these provisions do not apply to the policy involved here because this is an accident and death policy and not a life insurance policy within the meaning of the statute, and cases are cited sustaining this contention. It must be conceded that the authorities are in conflict upon this question. No Michigan case is cited upon this point, though we have a statute with substantially the same provisions as the Illinois statute. See section 2, Act No. 187, Pub. Acts 1907 (3 How. Stat. [2d Ed.] § 8313), and section 6 of Act No. 236, Pub. Acts 1909

(3 How. Stat. [2d Ed.] § 8317). The case of *Logan* v. *Fidelity & Casualty Co. of New York*, 146 Mo. 114 (47 S. W. 948), is an instructive one. The defendant in that case is the same defendant as is now before us, and it there urged a similar defense. The opinion is too long to quote here. We content ourselves with excerpts from it:

"Section 5855, Revised Statutes 1889, reads as follows: 'In all suits upon policies of insurance on life hereafter issued by any company doing business in this State, it shall be no defense that the insured committed suicide, unless it shall be shown to the satisfaction of the court or jury trying the cause, that the insured contemplated suicide at the time he made his application for the policy, and any stipulation in the policy to the contrary shall be void.'

"Appellant's contention is that when section 5855 was enacted, it related to life insurance in its usual and ordinary significance, and referred to those life policies issued by life insurance companies furnishing the indemnity to the insured from death from any and every cause, and not otherwise. * * * When a policy covers loss of life from external, violent, and accidental means alone, why is it not insurance on life? Such a provision incorporated in a general life insurance policy admittedly would be insurance on life, then why less insurance on life because not coupled with provisions covering loss of life from usual or natural causes as well? If one holds a general life policy and an accident policy, and is killed by lightning or commits suicide, so that he may be said to have died by accidental means, both the companies should pay, and the stipulation against liability in the event of suicide in the policies should be no more a defense against the suit upon the accident policy, providing against death from accidental cause, than against the policy which goes further and covers death from other causes as well. * * *

"The mere addition of one or more features or elements in a contract of insurance on life that may serve to give the contract or policy a particular designation in the business or insurance world will not, in the least, divest the contract or policy of its chief

character, of insurance on life, or make the contract other than life insurance. The promise to pay a weekly indemnity, by an insurance company, in the event the insured receives an injury from an accident not resulting in death, does not change the character of the agreement of the policy to pay a certain other sum when the accident results fatally, which is life insurance from accidental causes.   *   *   *

"The calling of a contract of insurance an accident, tontine, or regular life policy, or, for that matter, by any other appellation that may be adopted for business or conventional uses or classification, cannot make a policy containing an agreement to pay to another a sum of money designated upon the happening of an unknown or contingent event depending upon the existence of life less a policy of insurance on life.

"Insurance on life includes all policies of insurance in which the payment of the insurance money is contingent upon the loss of life."

See, also, Vance on Insurance, p. 564, and note; Richards on Insurance, § 384, and notes. We think the suit was commenced in time.

Two groups of assignments may be treated together. It is said the court erred: (*a*) In allowing the deposition of Dr. Hertel to be read; and (*b*) in permitting the testimony of the mother as to statements made by the assured as to ptomaine poisoning.

(*a*) It was the claim that the assured was poisoned by eating tainted food. Within a day or two after he was taken sick he consulted Dr. Hertel in Chicago. This was on October 21st. His testimony in part was:

"*A*. I made an examination of the heart, thorax, and lungs, and found them to be in a perfectly healthy condition. In fact the patient was in a perfectly healthy condition, so far as I could see outside of his symptoms. From the examination I made I was able to form a professional opinion of the trouble he was suffering from at that time.

"*Q*. What is your professional opinion as to what the trouble was from which Mr. Johnson was suffering on the date he visited you?   *   *   *

"*A.* I diagnosed the case as ptomaine poisoning.
*   *   *

"*Q.* Doctor, tell the symptoms of ptomaine poisoning as briefly as you can?

"*A.* Severe pains in the abdomen, temperature, nausea, vomiting, possibly chills, headache; the pains are of a severe lancinating character. Diarrhea is not necessarily one of the symptoms."

This was objected to for the reason that the physician is not permitted to disclose any knowledge he obtained by reason of the examination of Mr. Johnson, and that it is in violation of our statute governing the rules of evidence. Such information would be privileged, and under the statute he could not disclose it.

"*The Court:* The question is whether the beneficiary can waive the privilege.

"The court overruled the objection and defendant excepted."

We think the ruling of the court was correct. *Grand Rapids, etc., R. Co.* v. *Martin,* 41 Mich. 667 (3 N. W. 173) ; *Scripps* v. *Foster,* 41 Mich. 742 (3 N. W. 216) ; *Fraser* v. *Jennison,* 42 Mich. 206 (3 N. W. 882) ; *Briesenmeister* v. *Knights,* 81 Mich. 525 (45 N. W. 977) ; *Slater* v. *Sorge,* 166 Mich. 173 (131 N. W. 565), and *In re Oldenberg's Estate,* 177 Mich. 150 (142 N. W. 1076).

(*b*) This testimony relates to what was said and done in an interview in the presence of the mother, the sister, and another between Dr. Hanson, who was produced as a witness by defendant, and the deceased. It was offered as rebuttal testimony, Dr. Hanson having testified that at the request of the company he made an examination of the deceased and made a report to the company, which report was allowed in evidence, as was a letter written by the company following the report, to the plaintiff, in which it was stated: "Your physician and our physician have both advised me that Mr. Johnson's disability was

occasioned by tuberculosis." This testimony was competent as rebuttal testimony.

It is insisted there is no liability because there was no payment of premiums. The policy commences as follows: "Railroad Employees' Installment, Accident and Health Policy." In the general provisions of the policy appears the following:

"Article 11. Section A. If the first payment under the order on the paymaster of the assured's employer bearing even date and number with this policy is made at the time specified in said order for said payment this policy shall continue in force for 60 days; if the said payment is not made at the said time this policy shall immediately thereupon terminate without any action on the part of the company and the assured shall immediately pay to the company the earned premium for the time the policy shall have been in force."

"Section C. If any one of the payments specified in said order subsequent to the first payment is not made at the time specified in said order for any such payment, this policy shall terminate at the end of the period for which the last payment under said order was actually made, without any action on the part of the company."

"Article 14. This policy is issued in consideration of the premium and of the statements which are set forth hereon in the Schedule of Warranties and which the assured makes and warrants to be true by the acceptance of this policy."

In the schedule of warranties appears the following:

"I am employed by the Pullman Company, whose business is Pullman Company, located at Central district, city of Chicago, State of Illinois. My occupation is conductor. The duties of my occupation are fully described as follows: Conductor. My monthly wages are $70. The order on the paymaster referred to in this policy provides for the following payments to be made from my wages as follows: First payment of $6.50, from month of October, 1911. Second payment of $6.50 from month of November, 1911.

Third payment of $6.50 from month of December, 1911. Fourth payment of $6.50, from month of January, 1911."

The following stipulation was made at the trial: That Lawrence Johnson left the employ of the Pullman Car Company on or about October 23, 1911, and came to Port Huron, where he remained until his death, November 21, 1911. That under the terms of the policy in issue the first installment of premium to be paid thereon, to wit, the sum of $6.50, would have been payable out of his pay for the month of October, which according to the Pullman system would not be payable until the 15th of November. That on or before November 15th, the defendant received notice from the Pullman Company that Johnson had left its employ. At the time of leaving the employment of the Pullman Company there were moneys belonging to Johnson for his wages as Pullman conductor during October $29.35. This money remained in the hands of the Pullman Company until January 4, 1912, when a check for the sum was sent to Mrs. Catherine Johnson, the plaintiff.

The case is within *Lyon* v. *Insurance Co.*, 55 Mich. 141 (20 N. W. 829, 54 Am. Rep. 354), and is not in conflict with the majority opinion in *Geddes* v. *Relief Association*, 178 Mich. 486 (144 N. W. 828). See, also, 1 Am. & Eng. Enc. of Law, p. 289.

It is said death as the result of ptomaine poisoning does not create liability under this policy, counsel citing *American Accident Co.* v. *Reigart*, 92 Ky. 142 (17 S. W. 280), and *Bacon* v. *Accident Ass'n*, 123 N. Y. 304 (25 N. E. 399, 20 Am. St. Rep. 748). The first of these citations relates to the improper taking of an appeal and is not in point. The second case is distinguishable and is not controlling. The instant case is more like *Paul, Adm'r*, v. *Insurance Co.*, 112 N. Y. 472 (20 N. E. 347, 3 L. R. A. 443, 8 Am. St. Rep. 758), where the liability of the company was sustain-

ed. No question would be raised here, I take it, if the assured by mistake had taken carbolic acid, when he intended to take a helpful medicine. *Travelers' Insurance Co.* v. *Dunlap*, 160 Ill. 642 (43 N. E. 765, 52 Am. St. Rep. 355). Why, then, should it be said there is no liability when the assured, intending to take nourishing food, in fact took tainted food, which resulted in ptomaine poisoning and death? See Vance on Insurance, pp. 570, 576, and notes; Richards on Insurance Law, § 386, and notes; 1 Am. & Eng. Enc. of Law, p. 272, and p. 294; *Freeman* v. *Accident Ass'n*, 156 Mass. 351 (30 N. E. 1013, 17 L. R. A. 753); *Jiroch* v. *Insurance Co.*, 145 Mich. 375 (108 N. W. 728).

The other assignments of error have had our attention; we think it unnecessary to discuss them.

In the instant case there is a great conflict in the testimony. Young Johnson had lived in Port Huron for a long time prior to his going to Chicago on August 14, 1911. He took out the policy of insurance September 15, 1911. His sister testified in part as follows:

"Before my brother went to Chicago he was in perfect health, was tall, an athlete; played ball as a catcher on the Independent baseball team. * * * He was in perfect health all the time. * * * I never heard of his having consulted a physician nor was the subject of his having any ailment discussed in the family; never knew of his taking any medicine."

His mother, his brother, the city clerk of Port Huron, and the county clerk of St. Clair county, and others testified to substantially the same condition. We have already called attention to what Dr. Hertel observed October 21, 1911. Physicians were called on the part of the plaintiff as experts, who described ptomaine poisoning and its symptoms. These physicians, in answer to hypothetical questions which the

trial judge thought covered the history of the case, expressed the belief that young Johnson was suffering from ptomaine poisoning, and that the cause of his death was ptomaine poisoning.

"*Q.* From the history of the case which I read to you state whether in your opinion the cause of Lawrence Johnson's death could be attributable to pulmonary tuberculosis.

"*A.* Absolutely impossible. In pulmonary tuberculosis you never have vomiting; you very rarely have dysentery or diarrhea; you never have any abdominal pain. I have seen muscular contractions due to tuberculosis, but very, very seldom, and that would be in the very later stages.

"*Q.* Now as to the time from the beginning of the trouble until the death, what do you say about that?

"*A.* It is too absurd to even answer, almost. You never get pulmonary tuberculosis to kill in a month."

On the part of the defendant there was testimony tending to show that the assured died of tuberculosis. This raised a question of fact which was submitted to the jury in a charge which, when read as an entirety, presented the questions involved fairly and fully.

Judgment is affirmed.

BROOKE, C. J., and MCALVAY, KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.