Mary Ebbert, Appellee, v. Metropolitan Life Insurance Company, Appellant.

Gen. No. 38,912.

Opinion filed March 24, 1937. Rehearing denied April 12, 1937.

HOYNE, O'CONNOR & RUBINKAM, of Chicago, for appellant; NATHANIEL RUBINKAM and WILLIAM S. ALLEN, of Chicago, of counsel.

HAAS & LEFFMANN of Chicago, for appellee; HARRY L. MITCHELL and FERDINAND J. MANN, both of Chicago, of counsel.

MR. JUSTICE HALL delivered the opinion of the court.

This is an appeal from a judgment of the superior court of Cook county against the defendant, the Metropolitan Life Insurance Company and in favor of Mary Ebbert, widow of Harry J. Ebbert, deceased, for the sum of $8,090.56 and costs of suit. The trial was before the court without a jury.

The action is predicated upon two life insurance policies issued to Harry J. Ebbert. Each contains what is referred to as a double indemnity clause which provides that in addition to the principal amount agreed to be paid to the beneficiary upon proof of death of the insured, an additional amount would be paid in case his death was the result "directly and independently of all other causes, of bodily injuries sustained through external, violent and accidental means," and "that death shall not have been the result of self-destruction, whether sane or insane, or caused by, or contributed to, directly or indirectly, or wholly or partially, by disease, or bodily or mental infirmity." In one policy, the amount of the additional indemnity agreed to be paid is $1,675, and in the other, $6,000. The principal death claims under both policies were paid.

Plaintiff's contention is that the means or cause of the death of the insured was the administration to him of ether as an anesthetic in and about the performance of a surgical operation for the removal of the tonsils of the insured, and that as the direct result of the ad-

ministration of the ether, the insured died. It is the claim of plaintiff that the means and methods employed by the physicians performing the operation were those usually and customarily adopted and used by physicians and surgeons in the administration of anesthetics; that the death was not the result of self-destruction, nor caused by or contributed, directly or independently, or wholly or partially, to disease, or to bodily or mental infirmity, but that an effect which is not the natural or probable consequence of the means which produced it, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing, is produced by "accidental means." We have quoted literally from the statement in plaintiff's brief, and we presume the meaning is that plaintiff is entitled to recover under the terms of the policy upon the theory that the evidence adduced indicates that the insured's death came about through "accidental means."

Defendant admits the execution and delivery of the policies and the death of the insured, but denies that his death, directly and independently of all other causes, was the result of bodily injury sustained through "external, violent and accidental means," insists that the death of the insured was the result of disease and bodily infirmity, and denies that the cause of the death of the insured was the administration of the ether to the insured as an anesthetic.

Harry J. Ebbert died on June 6, 1934, while undergoing an operation for the removal of his tonsils. It is in evidence that at that time, he was 52 years of age, weighed 188 pounds; that since the year 1924 he had played golf frequently, and that when playing golf, he walked several miles at a time; that he played golf two weeks before his death; that he was vigorous, that he had no shortness of breath, nor dizzy spells, and

that he could walk up several flights of stairs without evident fatigue, and that his breathing on such occasions was normal.

Dr. J. G. McNeil, a witness called by the plaintiff, testified that he had been practicing since 1921. After reviewing his experience and qualifications, this doctor testified that he specialized in surgery, and had performed a number of tonsillectomies,—somewhere between a thousand and fifteen hundred; that he examined the insured about June 3, 1934, for the purpose of determining his physical condition and in preparing for an operation for the removal of his tonsils, together with a submucous receptor in the nose of the insured; that at that time the witness gave the insured a physical examination and took a history of his past sicknesses and as to his general life; that at that time the insured stated to this witness that he had never had typhoid, pneumonia, scarlet fever, diphtheria or influenza, and that he had never had excessive diarrhea; that the insured then stated that he took exercise, and that he frequently played 18 to 36 holes of golf without being tired and without exhaustion. This doctor also testified in substance that the physical examination made of the insured by him consisted of taking the insured's blood pressure, and that his blood pressure was ''132 over 96''; that the examination of the insured's throat showed a large pair of tonsils producing a sort of obstruction in the throat, and that he had a small deflected septum, and that this produced a lot of mucous, which dropped back into the throat and bothered him considerably, causing him to cough; that the chest and lungs of the insured were negative, and that the heart was negative; that when he examined the insured as to the condition of his heart, he had him run about the room for the purpose of determining whether the heart would shortly return to the normal beat, which it did; that the abdomen was

negative; that his reflexes were normal, and that the urinalysis and blood count were negative. This physician testified that by negative he meant that he did not find any positive findings of disease; that his heart tones were perfectly normal, and that the heart was not enlarged; that the examination of the insured's abdomen indicated a negative history, and that the insured had no acute intestinal condition of any sort; that this examination occurred three or four days before the insured was operated upon. This physician then testified that he formed an opinion at that time that the tonsils should be removed, and that he could safely and perfectly perform such operation; that on June 6, 1934, he examined the insured before taking him to the operating room, that he went over his chest and heart, and that at that time, the witness formed the opinion that the insured was physically all right to take the anesthetic and to be operated upon for the condition of his tonsils and septum; that he then removed the right tonsil and inserted a sponge or forceps to stop the hemorrhage, which usually occurs after such an operation; that the hemorrhage in the case of the insured was not severe, and that he removed the tonsil on the left side, and that the same conditions prevailed on the right side; that ether was administered to the insured by the drop method, and that during the time the patient was taking the ether, his respiration was normal, as well as his color; that he had given about two thousand anesthetics, and had observed it in several thousand cases and that he was able to determine whether the insured was being properly anesthetized, and that every patient is different under such circumstances, as to the amount of the anesthetic. He stated that he was present when they started to anesthetize the insured, and that the anesthetic was given to him by a Miss Kelly; that coagulation took place on the wound after about three and a

half minutes; that the bleeding ceased, and that then the patient suddenly stopped breathing; that artificial respiration was given him, the rectum was dilated, that he was given stimulation by injection of sodium caffeine benzoate, that they gave him an injection of adrenalin into the heart, and that after possibly a half hour, they were unable to stimulate the respiration and that the patient was dead. This doctor testified that in his opinion, the insured died from a supersusceptibility or idiosyncrasy from ether that caused respiratory paralysis. Also, that he had an opinion that there was nothing in the man's physical condition nor any "bodily infirmity of this man that would contribute to the cause of his death."

Dr. Alfred D. Biggs, the coroner's physician of Cook county, testified to the effect that he made a complete post mortem examination of the trunk of the body of the deceased, of the organs, chest and abdomen, and found that there were marked fatty changes in the liver; that there was a moderate hypertrophy of the myocardium, meaning the heart muscle; that there was passive congestion of the spleen and kidneys, and that the tonsils had been removed; that the liver showed about 90 per cent yellow, that is, that there were marked or extensive fatty changes; that the heart showed a moderate hypertrophy in the myocardium, which means that there was some enlargement of the heart; that after the examination, he formed an opinion as to what caused the death of the patient, which was that the patient succumbed to a complication of two factors; that one of them was a certain amount of degenerative changes of the heart muscle, and the other factor was surgical shock and anesthesia, the surgical shock and anesthesia grouped as one thing. He stated that these certain changes in the heart are referred to as myocarditis—chronic myocarditis. He testified further as follows: "I don't

think I can state how long it [the condition of the insured] has been. I think it was chronic but as to assigning a number of months or years that it might have existed, I don't think I could do that reasonably well.'' Referring to other conditions found, he testified that ''The body is obese. The neck is very short. The liver is down 3 finger breadths in the mid line. The cut surface of the liver is 95% yellow. The lobular markings are almost lost. The stomach is ballooned up with air. Its lining and that of the intestines are normal. The heart is distinctly larger than normal. The ventricular wall is thicker than normal. The myocardium is light brown. . . . The kidneys are dark red, the capsule strips easily leaving a pitted surface. The pancreas and adrenals appear normal. The spleen is large and soft, its cut surface chocolate brown,'' and that ''I thought that the death occurred because of two factors, one the heart changes and the other surgical shock and anesthesia.'' On cross-examination, he testified that ''I determined that there was a cloudy swelling of the myocardium by looking at it. A cloudy swelling, as I used the term . . . means a cooked appearance of the heart muscle, and that is determined by looking at it. . . . In my opinion this heart was bigger, the muscle walls of the heart were thicker than for an individual of that size.''

Dr. Overton Brooks, a witness called by the defendant, testified that he had practiced medicine and surgery for almost 30 years; that he was a graduate of the Northwestern University, and was connected with St. Joseph's and the Henrotin Hospitals, and is surgeon for the Chicago Great Western Railroad and the Erie Railroad, and that he is in active practice as a surgeon. He further testified, in substance, that he was familiar with the organ of the body known as the liver, and that ''Assuming that a man has a liver that is ninety-five per cent yellow, that liver would show a

very distinct pathology. It might be that he has what
we call a fatty infiltration or fatty degeneration of the
liver; that is, the cells have turned to fat. It might
be that he has a hardening of the liver, what we call
cirrhosis of the liver, due to some chronic poisoning.
It might be what we call an amyloid liver, which is
usually brought on by some toxic, long drawn out,
poisonous condition, like tuberculosis or syphilis or
something like that. It might be due to bile getting
into the liver through a cancerous condition there, or
some inflammatory condition in the gall bladder which
stops up the bile and it is thrown into the liver. It
might indirectly come from diseased tonsils. The
greatest function of the liver is the storage of the food
product that gives heat and life to the body, and it
also takes care of the poisons, a detoxifier. It takes
care of the poisons that might be sent into the body
and eliminates them through the bile into the intes-
tines." The abstract indicates that the witness was
asked a hypothetical question, which is not there set
forth, and that his answer was as follows: "I have an
opinion based on these facts, assuming each and every
fact which has been related to be true and basing an
opinion on these facts, upon reasonable medical cer-
tainty as to the cause of the death of this hypothetical
man. It is my opinion that this man died with this
group of symptoms or signs that he had there, leaves
the impression to me that he had a chronic condition
for years that was brought about by some poisonous
substance, or either bacterial poison, germ poison or
chemical poison, that has been existing for a long time.
And I am of the belief that this pathological condition
as shown was the cause of this man's death; and the
anesthetic was a contributing cause of his death. If I
might state my belief, I have my belief on this subject
because asphyxial death in this time and day is really
very rare through asphyxia because in a properly

equipped hospital and people that are properly trained, asphyxia from any cause whatsoever, electrical things or carbon monoxide or automobile fumes or any of those things, if they are properly taken care of immediately rebreathing takes place. And I might say it is considered really a rare condition in the operating room or anywhere else, unless there is some other underlying condition, such as we find in this picture and such as we find in the enlarged thymus gland situated over the heart that has been carried on through years. Usually it subsides in childhood; in some cases it is carried on even up until this age, but that is rather rare. But I would say that there must be some obstruction or some deformity or something like that that would really cause a man to die on the operating table and not just asphyxia alone. The fact that this man coughed just before he died would indicate that his reflexes were returning and he was coming out from under the anesthetic. I shouldn't think men die from ether if they are coming out of the ether. I think that the heart condition with the liver condition, the tonsil condition, the fact that the tonsils were so large they interfered with his breathing at times, might even have caused his death.''

Another physician, Dr. Charles M. Fox, testified substantially as the witness just referred to.

Dr. Harry C. Harris, called by defendant, testified that he graduated from the University of Illinois in 1926, and from the University College of Medicine. After reciting his general experience, he testified that ''During my experience as a physician and surgeon, I have had occasion to see the effect of ether on the human body. I have administered ether on many occasions. Ether has the property of producing anesthesia by paralyzing the higher nerve centers of the brain, known as the respiratory center and the circulatory center. When administered, it passes in the

average through four normal phases. First is the stage of focal irritation, . . . where the ether irritates the throat and produces a cough. One accident in the use of ether at this time in which it may cause death is due to the fact that if an operation is performed about the head at this time it may cause a reflex action set up in one of . . . the five cranial nerves. . . . The second stage is that exemplified by a spell of anxiety, . . . because of the stimulation of the cerebrum of the brain. . . . At this stage no deaths are reported from the use of ether. . . . The third stage of ether anesthesia is that exemplified by a tetanic spasm of all the muscles in the body. And in this stage there may result a tetanic convulsion of the muscles of respiration, and at this stage if in the administration of ether these tetanic convulsions take place and the respiratory muscles become so grasped and tetanic, then respiration may cease because of this action and the blood is dammed back on the right side of the heart and the heart dilates and the patient dies.'' This witness was asked a hypothetical question, which does not appear in the abstract. In answer, he said: ''My opinion is that the deceased came to his death as a result of the combined effects of pre-existing pathology that contributed to the administration of ether. When I refer to pre-existing pathology, I refer to the tonsils, to the heart, and to the liver, to the blood vessels and to the kidneys and to the general status or make-up of the individual and his age.'' His testimony is further to the effect that, considering the physical history of the insured, the opinion of the witness was that ether should not have been administered as an anesthetic in the removal of the tonsils of the insured.

In *Wayne v. Travelers Insurance Co.*, 220 Ill. App. 493, suit was brought on an accident insurance policy by the beneficiary. The policy was issued to one John

Beakley, and contained the provisions that he was insured "against loss resulting from bodily injuries, effected directly and independently of all other causes, through external, violent, and accidental means," and that "this insurance shall not cover accident, injury, disability, death or other loss caused directly or indirectly, wholly or partly, by bodily or mental infirmity, ptomaines, bacterial infections (except pyogenic infections which shall occur simultaneously with and through an accidental cut or wound), or by any other kind of disease." Prior to the death of the insured, on August 2, 1917, the statement of the court indicates, he had been treated for syphilis, and on that date, the doctor injected 0.6 grams of arsenobenzol. In its opinion, the court refers to a description of the technic of this operation given by a witness, and concludes that the manner of the injection seems to have been entirely regular and that no question was raised in this respect. Within 30 minutes after the last injection the patient fainted and respiration was disturbed; a pulmotor was used under an experienced man, but in about two hours the patient died. The physician testified that no such result from the injection was expected. The post-mortem showed that the muscles of the throat were swollen, the membrane on the inside edematous, and the throat closed. The physician referred to made out the death certificate, wherein he stated that the cause of death was edema of the glottis following an injection of arsenobenzol, 0.6 grams, and "contributory syphilis, duration five years." In its opinion, after referring to the fact that the evidence in that case showed that Beakley was suffering from syphilis which directly contributed to his death, and that he, therefore, could not recover, the court said:

"Another bar to recovery is found in the words, 'accidental means,' in the insuring clause. It is pointed out in many cases that these words are not the same as

an accidental injury or accidental death. These cases hold, in substance, that where the means are voluntary and intelligent and the act performed without error, even though death should unexpectedly result, death is not effected by accidental means. Among such cases are *Higgins v. Midland Casualty Co.*, 281 Ill. 431; *United States Mut. Acc. Ass'n v. Barry*, 131 U. S. 100; *Smith v. Travelers' Ins. Co.*, 219 Mass. 147, and cases there cited; *Shanberg v. Fidelity & Casualty Co.*, 158 Fed. 1. Entirely applicable to the present case is the language in the opinion in *Riley v. Interstate Business Men's Acc. Ass'n* (Iowa), 152 N. W. 617:

" 'Thus it is apparent that to entitle one to recover, under a policy like the one in question, it is not sufficient to show that the death was accidental. Death is the result of some precedent act or condition. It is traceable to some cause. It is not sufficient, to make the *cause accidental,* that it appear that the resulting death was unanticipated, unforseen, and not expected as a result of the act done. It must appear that that which happened to produce the result happened through accident, in order that the proper foundation may be laid for the recovery. The policy provides recovery in the event of death, but only where death results from bodily injuries effected solely by external, violent, and accidental means.'

"In Joyce on Insurance (2nd Ed.), vol. 5, sec. 2863, the author discusses at length the distinction between accidental death and accidental means, saying among other things:

" 'A person may do certain acts, the result of which acts may produce unforseen consequences and may produce what is commonly called accidental death, but the means are exactly what the man intended to use, and did use, and was prepared to use. The means were not accidental, but the result might be accidental.' "

Plaintiff cites the case of *Christ v. Pacific Mut. Life Ins. Co.,* 312 Ill. 525. In that case, the insured, under a policy containing provisions exactly similar to those contained in the policy in issue here, contracted typhoid fever from drinking contaminated water and died as a result therefrom, and the same question was raised as to whether or not, under the facts stated, the beneficiary could recover upon the theory that the insured lost his life by "external, violent and accidental means." In holding that there was a right to recover, the Supreme Court said:

"The means by which disease is acquired being the entrance of the typhoid bacilli into the system, if the means of such entrance are accidental the resulting typhoid fever and its fatal effect may also be said to be accidental.

"We have had occasion in a number of cases to define the term 'accident' as used in accident insurance policies. In *Hutton v. States Accident Ins. Co.,* 267 Ill. 267, we said that an effect which is the natural and probable consequence of an act or course of action cannot be said to be produced by accidental means. After citing several cases the rule announced in *Prudential Casualty Co. v. Curry,* 10 Ala. App. 642, was approved, that 'an accident may be said to be an unforseen or unexpected event of which the party's own misconduct is not the natural and proximate cause, and hence the result ordinarily and naturally flowing from the conduct of the party insured cannot be said to be accidental even when he may not have forseen the consequences. . . . The happening of an event, to be properly termed an accident, must not only be unforseen but without the design and aid of the person.'

"In *United States Mutual Accident Ass'n v. Barry,* 131 U. S. 100, the complaint charged that the insured jumped from a platform four or five feet high to the

ground, and in alighting unexpectedly received an accidental jar and sudden wrenching of his body which caused a stricture of the duodenum, from the effects of which he died a few days later. It was urged that there was no evidence to support the verdict because no accident was shown. The court did not concur in that view, but said: 'The two companions of the deceased jumped from the same platform at the same time and place and alighted safely. It must be presumed not only that the deceased intended to alight safely but thought that he would. The jury were, on all the evidence, at liberty to say that it was an accident that he did not. The court properly instructed them that the jumping off the platform was the means by which the injury, if any sustained, was caused; that the question was whether there was anything accidental, unforeseen, involuntary, unexpected, in the act of jumping, from the time the deceased left the platform until he alighted on the ground; that the term "accidental" was used in the policy in its ordinary, popular sense, as meaning "happening by chance; unexpectedly taking place; not according to the usual course of things; or not as expected"; that if a result is such as follows from ordinary means voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs, which produces the injury, then the injury has resulted through accidental means.'

"The *Barry case* is a leading case, which is usually cited in cases on accident policies involving the question of what constitutes an accident. The language quoted was approved in *Higgins v. Midland Casualty Co.*, 281 Ill. 431, which quoted from *Bryant v. Continental Casualty Co.*, 107 Tex. 582, as follows: 'The proper and true test in all instances of voluntary ac-

tion is that defined in the *Barry case.* If in the act which precedes the injury, though an intentional act, something unforeseen, unexpected and unusual occurs which produces the injury, it is accidentally caused.' In the *Higgins case* it was held that sunstroke was a bodily injury sustained solely through accidental means within the meaning of the policy. It was held to be an accident under the Workmen's Compensation Act in *City of Joliet v. Industrial Com.,* 291 Ill. 555. Anthrax, though a disease, is an accident under the Workmen's Compensation Act if accidentally contracted in the course of ·the employment. (*Chicago Rawhide Manf. Co. v. Industrial Com.,* 291 Ill. 616; *McCauley v. Imperial Woolen Co.,* 261 Pa. St. 312; *Turvey v. Brinton,* A. C. (1905) 230.) So is arsenical poisoning. (*Matthiessen & Hegeler Zinc Co. v. Industrial Board,* 284 Ill. 378.) In *Stedman v. United States Mutual Accident Ass'n,* 123 N. Y. 307, however, death resulting from anthrax caused by contact with putrid animal matter containing anthrax bacilli was held not to be accidental within the meaning of a policy insuring against death from external, violent and accidental means. The taking of poison; (*Healey v. Mutual Accident Ass'n,* 133 Ill. 556; *Travelers' Ins. Co. v. Dunlap,* 160 id. 642; *Metropolitan Accident Ass'n v. Froiland,* 161 id. 30;) the inhaling of gas; (*Travelers' Ins. Co. v. Ayers,* 217 Ill. 390; *Paul v. Travelers' Ins. Co.,* 112 N. Y. 472;) suffocation by drowning; (*Mallory v. Travelers' Ins. Co.,* 47 N. Y. 52; *Clark v. Iowa State Traveling Men's Ass'n,* 156 Iowa, 201;) the eating of tainted food (*Johnson v. Fidelity and Casualty Co.,* 184 Mich. 406,) or of poisonous mushrooms; (*United States Casualty Co. v. Griffis,* 186 Ind. 126;) the opening of a pimple; (*Lewis v. Ocean Accident Corp.,* 224 N. Y. 18;) fright caused by insured's horse running away while the insured was riding in a covered carriage and coming near colliding with other teams

though no collision occurred; (*McGlinchey v. Fidelity and Casualty Co.*, 80 Me. 251;) under ordinary circumstances are all accidental means by which bodily injuries are produced through which death sometimes results."

We have quoted at length from this opinion for the reason that the Supreme Court has there so carefully reviewed the law applicable to the case at bar.

In the case at bar, as in the *Wayne* case, the evidence is clear that the "means" through which the insured lost his life, was not accidental. In Standard Dictionary, "means," plural of mean, is defined as "the medium through which anything is done. The process adopted in order to attain an end; instrumentality. In this sense it is often construed as a singular noun, as, no other means is left; this will be a means to the desired end." In the *Christ* case, in holding that, under the circumstances plaintiff might recover, the court concluded with the following:

"Violence causing a bodily injury is not necessarily limited to physical force, but the *accidental* introduction into the body of a foreign substance which causes death or extreme bodily injury." (Italics ours.)

Standard Dictionary defines "violence" as follows: "The quality, character or state of being violent, . . . in a physical sense." "Violent" is defined as follows: "Proceeding from or marked by great and intense physical force, . . . as a violent attack; a violent blow."

In the instant case, the insured voluntarily submitted to the administration of the anesthetic and the operation, and there is no claim but that the operation was skilfully performed. Further, there is no showing and no claim that the anesthetic was not properly and skilfully administered. The facts are exactly similar to those in the *Wayne* case. See also *Travelers' Protective Ass'n of America v. Davis*, 67 F. (2d) 260.

In a supplemental brief, plaintiff cites the case of *Burns v. Metropolitan Life Ins. Co.*, 283 Ill. App. 431. In that case, the insured was killed as a result of a fall to the sidewalk from a window of an apartment in which she lived, and this court held that under a policy containing the same provision as the policy in the case at bar, the beneficiary might recover. There is no similarity whatever between the facts in that case and the facts in the instant case.

The preponderating weight of the evidence here indicates that the insured was suffering from disease which directly contributed to his death. The evidence also shows that his death was not the result "directly and independently of all other causes of bodily injuries sustained through external, violent and accidental means." The judgment of the superior court is reversed, and it is ordered that judgment be entered here against plaintiff for costs of suit.

*Reversed and judgment entered here for costs of suit.*

DENIS E. SULLIVAN, P. J., and HEBEL, J., concur.