[Civ. No. 3043. Second Appellate District, Division Two.—January 13, 1920.]

JESSIE BALCH HORTON, Appellant, v. THE TRAVELERS INSURANCE COMPANY (a Corporation), Respondent.

[1] ACCIDENT INSURANCE — MEANS OCCASIONING DEATH — ACTION ON POLICY—SUFFICIENCY OF COMPLAINT.—In an action upon an accident insurance policy a complaint is sufficient as against a general demurrer where, adopting the language of the policy, it avers in general terms that the insured met his death from bodily injuries effected through "external, violent and accidental means," and that his death was occasioned by such means alone, without averring the particular facts and circumstances attending the death or injury.

[2] ID.—INCONSISTENCY BETWEEN GENERAL AND SPECIFIC AVERMENTS —PRECEDENCE TO BE GIVEN.—While specific averments must be

given precedence over general averments where there is an inconsistency between the general and specific averments, in the absence of any inconsistency, the general averments, if necessary, may be looked to to complete the essentials of a cause of action.

[3] ID.—GENERAL AVERMENTS FOLLOWING LANGUAGE OF POLICY—SUFFICIENCY OF COMPLAINT—ABSENCE OF INCONSISTENCY WITH SPECIFIC AVERMENTS.—In an action upon an accident insurance policy insuring against death "from bodily injuries, effected directly and independently of all other causes, through external, violent and accidental means," the complaint alleges a cause of action where it states in general terms that death was caused by such means, and there is no inconsistency between such general averment and a further specific averment that death was the result of blood poisoning caused by the introduction of virulent germs into the body of the insured by and through the use of dental instruments with such germs unexpectedly and unintentionally thereon.

[4] ID.—COMMISSION OF VOLUNTARY ACT BY INSURED—ABSENCE OF "ACCIDENTAL MEANS."—If the insured does a voluntary act, the natural, usual, and to be expected result of which is to bring injury upon himself, an injury or death so occurring is not produced by "accidental means."

[5] ID.—INSURANCE AGAINST DEATH OR INJURY EFFECTED BY ACCIDENTAL MEANS—NECESSITY FOR MEANS OF UNEXPECTED OR UNFORESEEN CHARACTER.—Where the policy does not insure against accidental death or accidental injuries, but against death or injuries effected by accidental means, it is not enough that the death or injury should be unexpected or unforeseen; there must be something of an unexpected or unforeseen character in the means through which the injury was sustained or the death produced.

[6] ID.—DEATH DUE TO BLOOD POISONING FROM SEPTIC DENTAL INSTRUMENTS—PRESENCE OF EXTERNAL, VIOLENT AND ACCIDENTAL MEANS.—The death of the insured through the unintentional introduction into his system of virulent germs contained on, what he supposed were clean and aseptic dental instruments was due not only to "accidental means," but the means was "external and violent," within the meaning of those words as used in such a policy.

[7] ID.—EXTERNAL MEANS DEFINED.—In such cases, the means is "external" when the cause of the injury or death is external to the person, though it acts internally.

[8] ID.—VIOLENT MEANS DEFINED.—The means is "violent," within the meaning of a policy insuring against accidental death or accidental injury, whenever any force, however infinitesimal, is efficient in

6. Death or injury from blood poisoning resulting from insured's voluntary act as caused by accident or accidental means, notes, 7 A. L. R. 1133; 5 L. R. A. (N. S.) 926; L. R. A. 1917A, 1056.

producing the harmful result. It is not necessary that it shall be violent in the sense of breaking tissues or otherwise physically and visibly affecting the body.

[9] ID.—DEATH FROM DISEASE CAUSED BY ACCIDENTAL MEANS—ACCIDENTAL MEANS AS CAUSA CAUSANS.—Where the insured dies of a disease, but such disease is a mere link in the chain of causation between the accidental means and the death which it produces, it is not an intervening and independent cause, and the death must be regarded as due to the accidental means.

[10] ID.—DISTINCTION BETWEEN VOLUNTARY ACT AND VOLUNTARY EXPOSURE TO DANGER.—There is a marked distinction between a voluntary act and a voluntary exposure to danger. The act done may be voluntary, but it cannot imply a voluntary danger that turns out to be the real efficient cause of the death or injury, unless the danger is known and realized.

APPEAL from a judgment of the Superior Court of Los Angeles County. Fred H. Taft, Judge. Reversed.

The facts are stated in the opinion of the court.

H. T. Morrow for Appellant.

O'Melveny, Millikin & Tuller, Walter K. Tuller, O'Melveny, Stevens & Millikin and Sayre Macneil for Respondent.

FINLAYSON, P. J.—This is an action upon an accident insurance policy executed by defendant to plaintiff's deceased husband, George Ray Horton, whereby he was insured against death "from bodily injuries, effected directly and independently of all other causes, through external, violent and accidental means." A general demurrer to the complaint was sustained by the court below; from the judgment thereupon entered, plaintiff has taken this appeal.

The question presented is: Do the facts alleged in the complaint show that the insured died from bodily injuries affected solely through "external, violent and accidental means"? The complaint alleges the circumstances attending the death of the insured as follows: "On or about December 8, 1914, at Los Angeles, California, and while said accident insurance policy was in force, said George Ray Horton received bodily injuries, effected directly and independently of all other causes, through external, violent,

and accidental means, to wit, by the introduction of virulent germs by and through dental instruments with virulent germs unexpectedly and unintentionally thereon, causing blood poisoning, and said injuries directly and proximately caused, and resulted in, the death of said George Ray Horton on January 4, 1915. The use of said dental instruments with virulent germs thereon, as aforesaid, and the introduction of said virulent germs, as aforesaid, were, and each of them was, unforeseen, unintended, and unexpected by said deceased, or by anyone else, and said introduction of said virulent germs and the use of said dental instruments with virulent germs thereon, as aforesaid, were, and each of them was, external, violent, and accidental.''

[1] As against a general demurrer, a complaint is sufficient where, adopting the language of the policy, it avers in general terms that the insured met his death from bodily injuries effected directly through ''external, violent, and accidental means,'' and that his death was occasioned by such means alone, without averring the particular facts and circumstances attending the death or injury, as plaintiff has done in this case. (*Richards* v. *Travelers' Ins. Co.,* 89 Cal. 170, [23 Am. St. Rep. 455, 26 Pac. 762]; 1 C. J. 489.) [2] It is, it is true, the general rule that specific averments must be given precedence over general averments, inasmuch as the general allegations are deemed explained, limited, and controlled by the specific allegations; but this is true only where there is an inconsistency between the general and specific averments. In the absence of any inconsistency, the general averments, if necessary, may be looked to to complete the essentials of a cause of action. [3] If, in the instant case, the general allegations alone be looked to, the complaint unquestionably alleges a cause of action (*Richards* v. *Travelers' Ins. Co., supra*), and we think the specific averments are entirely consistent with the general averments and with the statement of a cause of action.

The circumstances attending the death of the insured, as disclosed by the complaint, appear to be substantially these: The death was the result of blood poisoning as the immediate cause; this blood poisoning was caused by the introduction of virulent germs into the body of the insured; these germs were on dental instruments; the infected dental

instruments were used in the course of a dental operation that was had upon the insured shortly before his death; thus were the germs introduced into the body of the insured, and, as alleged, the presence of the germs upon the instruments was unforeseen, unintended, and unexpected by the insured or by anyone else; the use of the instruments with the germs thereon was "external, violent and accidental."

Respondent contends that there can be no recovery where the injury or death is the result of the voluntary act of the insured, although such result may be entirely unexpected and undesigned. **[4]** Without doubt, there can be no recovery if the insured does a voluntary act the natural, usual, and to-be-expected result of which is to bring injury upon himself. An injury or death so occurring is not produced by "accidental means" in any sense of the word, legal or colloquial. (*Lickleider* v. *Iowa State Traveling Men's Assn.*, 184 Iowa, 423, [3 A. L. R. 1295, 166 N. W. 363, 168 N. W. 884].) **[5]** Where, as here, the policy does not insure against accidental death or accidental injuries, but against death or injuries effected by accidental means, it is not enough that the death or injury should be unexpected or unforeseen; there must be something of an unexpected or unforeseen character in the means through which the injury was sustained or the death produced. Admittedly, this is the established rule in this state. (*Rock* v. *Travelers' Ins. Co.*, 172 Cal. 462, [L. R. A. 1916D, 1196, 156 Pac. 1029].) But, though this unquestionably is the law, it is not applicable to the facts as alleged in the complaint now under consideration. Here, according to the complaint, the element of unexpectedness was in the preceding act or means which led to the death, namely, the use of instruments with virulent germs thereon, the presence of the germs being wholly unsuspected—and justly so, perhaps, for it is common knowledge that in modern surgery great pains are usually taken to avoid using unsterilized instruments, though, doubtless, whether this is the common experience is a question of fact for the jury.

In *Western Com. Travelers' Assn.* v. *Smith*, 85 Fed. 401, [40 L. R. A. 653, 29 C. C. A. 223], a leading case, it is said that the term "accidental means" is descriptive of "means which produce effects which are not their usual and probable consequences." See, also, *Lickleider* v. *Travel-*

*ing Men's Assn., supra*—a recent and well-considered case. The introduction into the insured's body of virulent, disease-producing germs was not the natural and probable consequence of the use by the dentist of dental instruments in the mouth of the insured, when proceeding in the manner usual and customary in such operations, if, as we are bound to infer from the allegations of the complaint, the usual and customary practice in such operations is to use none but clean and sterilized instruments. It doubtless is true that the insured knowingly and intentionally permitted the dentist to introduce the dental instruments into his mouth, but he did not know that he was permitting germ-infected instruments to be used in his mouth. The result, the death of the insured, was not the natural and probable consequence of using sterilized and aseptic instruments.

[6] The introduction of germs into decedent's system, and his resultant death, was not only an unexpected, unforeseen, unusual, and improbable consequence, but the means through which the death was produced, i. e., the dental instruments, contained something of an unexpected and unforeseen character, namely, the disease-producing germs. For this reason, while we quite agree with respondent's counsel when they say that the *means* must be accidental, and that a mere accidental *result* would not suffice under the language of this policy, nevertheless we are of the opinion that the unintentional introduction into the insured's system of virulent germs contained on what he supposed were clean and aseptic instruments, constituted "accidental means," within the meaning of the policy. In other words, it may well be that the alleged "accidental" feature of the case was an accidental and unsuspected infection of the dental instruments, or an accidental use by the dentist of the wrong instruments, as, for instance, the use of infected instruments accidentally and unintentionally commingled with his sterilized instruments or accidentally placed where none but his sterilized instruments were usually kept.

The case is clearly within the principle of those cases where it is held that if one drinks from a glass containing poison under the supposition that it is a glass of pure water, and death ensues, the death is caused by "external, violent and accidental means." In support of this principle

we cite the following: *Travelers' Ins. Co.* v. *Dunlap*, 160 Ill. 642, [52 Am. St. Rep. 355, 43 N. E. 765] (a case where the insured died as the result of taking, by his own hand, carbolic acid in place of a medicine which he desired to take for a sickness from which he was suffering); *Metropolitan Acc. Assn.* v. *Froiland*, 161 Ill. 30, [52 Am. St. Rep. 359, 43 N. E. 766] (a case where the insured died from poison which he drank by accident, intending to drink distilled water); *Healey* v. *Mutual Acc. Assn.*, 133 Ill. 556, [23 Am. St. Rep. 637, 9 L. R. A. 371, 25 N. E. 52] (deceased died not knowing that what he drank was poison; he took it and drank it accidentally); *United States Casualty Co.* v. *Griffis*, 186 Ind. 126, [L. R. A. 1917F, 481, 114 N. E. 83] (death due to ptomaine poisoning from eating mushrooms supposed to be edible); *Maryland Cas. Co.* v. *Hudgins*, 97 Tex. 124, [104 Am. St. Rep. 857, 1 Ann. Cas. 252, 64 L. R. A. 349, 76 S. W. 745] (death caused by eating unsound oysters in ignorance of their unsound condition); *Johnson* v. *Fidelity & Cas. Co.*, 184 Mich. 406, [L. R. A. 1916A, 475, 115 N. W. 593] (death from ptomaine poisoning, resulting from eating tainted food); *Carnes* v. *Iowa Travelers' Assn.*, 106 Iowa, 281, [68 Am. St. Rep. 306, 76 N. W. 683] (death was caused by taking morphine; held that if, by mistake or inadvertence, insured took more than he intended, the death was accidental); *Dezell* v. *Fidelity etc. Co.*, 176 Mo. 253, [75 S. W. 1102] (death from an overdose of morphine, taken to relieve neuralgia); *Dent* v. *Railway Mail Assn.*, 183 Fed. 843; Id., 213 Fed. 981, [L. R. A. 1915A, 314, 130 C. C. A. 387] (death from poison-ivy, with which insured came in contact while cutting a stick in the woods); *Sullivan* v. *Modern Brotherhood*, 167 Mich. 524, [Ann. Cas. 1913A, 1116, 42 L. R. A. (N. S.) 140, 133 N. W. 486] (a washerwoman's eye destroyed by gonococci with which her eye became infected from water in the washtub accidentally splashed into the eye); *Columbia etc. Co.* v. *Fidelity etc. Co.*, 104 Mo. App. 157, [78 S. W. 320] (kidney disease or dropsy, engendered by absorption of poison, resulting from handling infected rags or wallpaper). See, also, *Omberg* v. *United States Mut. Acc. Assn.*, 101 Ky. 303, [72 Am. St. Rep. 413, 40 S. W. 909] (death caused by blood poisoning resulting from the bite of a mosquito); also *Paul* v. *Travelers' Ins.*

*Co.,* 112 N. Y. 472, [8 Am. St. Rep. 758, 3 L. R. A. 443, 20 N. E. 347], and *Pickett* v. *Pacific Mut. Ins. Co.,* 144 Pa. St. 79, [27 Am. St. Rep. 618, 13 L. R. A. 661, 22 Atl. 871] (cases where death resulted from asphyxia caused by inhaling deadly gas).

The above cases, while not involving the identical facts here presented, lay down the principle which must govern. Applying the rules there announced, we must hold that the facts alleged in this complaint show that the insured's death was the result of "accidental means," as that term is used in the policy.

To support its theory, respondent has cited a large number of cases. These cases are so numerous that any attempt to notice them in detail would unduly prolong this already too extended opinion. Suffice it to say that every case relied on by respondent can readily be differentiated from this. Of the cases that respondent relies upon, the one which, in its facts, most closely approaches this is, we believe, the case of *Smith* v. *Travelers' Ins. Co.,* 219 Mass. 147, [L. R. A. 1915B, 872, 106 N. E. 607]. There the insured, who was affected with nasal catarrh, was in the habit of using a nasal douche. On one occasion, while using the instrument, he "snuffed" harder than usual, with the result that streptococci, germs frequently found in the outer nose, were carried from the nostrils through the Eustachian tube in the middle ear, and thence penetrated the brain, resulting in death from spinal meningitis. There was a hole or perforation in the mastoid bone through which the germ could pass from the ear into the brain. This, the opinion states, is a most unusual condition, found only in about one out of every one thousand skulls. The court held that there was nothing accidental in the inhalation; that, while the deceased "snuffed" harder than he had formerly done, he intended to do so, and the external act was what he proposed; that, though the result was unexpected, the means employed was not, and under such a policy recovery can be had only when the means employed is accidental. In that case the presence of the germs in a place where they are harmless, the outer nose, and the existence of the perforation in the mastoid bone, were not operating causes, but, as the Massachusetts court says, were internal *"conditions."* The only operating cause was the too violent

inhalation; but that act, which was the sole efficient cause of the death, was the voluntary act of the insured. The facts of that case presented a conscious and voluntary act co-operating with unknown internal conditions, and the ensuing death followed naturally from the one conscious and voluntary act of the insured. There was nothing accidental in the voluntary act, the inhalation of the douche, which, as the court says, was not harder nor more violent than the insured intended it to be. The case was within the doctrine of the Rock case (172 Cal. 462, [L. R. A. 1916E, 1196, 156 Pac. 1029]), because the external act of the insured was exactly what he intended it to be, though it produced internal consequences which he had not foreseen. In the case before us, the external act, namely, the introduction into the mouth of the germ-infected instruments, was not what the insured intended it should be. He intended that aseptic, not septic, instruments should be used in the dental operation; and the external act that resulted in blood poisoning, and consequent death, was as much accidental as if the insured had swallowed a lethal draught of poison under the mistaken supposition that it was a glass of crystal-pure water.

Not only was the insured's death due to "accidental" means, but the means was "external and violent," within the meaning of those words as used in the policy. [7] The means is external when the cause of the injury or death is external to the person, though it acts internally. "The insurance is not, by the first clause quoted, limited to an external effect, nor to one beginning at the surface. The accidental operation of external means may be wholly internal." (*Miller* v. *Fidelity & Cas. Co.*, 97 Fed. 836.) Here the disease-producing germs were introduced into decedent's system from without; therefore the means or cause of the death was an external cause. [8] The means not only was external, it was "violent," within the meaning of the policy. The degree of violence is not a controlling consideration. The term "violent" signifies merely that the external cause is efficient in producing a harmful result. "It is not necessary that it shall be violent in the sense of breaking tissues or otherwise physically and visibly affecting the body." (Vance on Insurance, p. 569.) The root meaning of the word "violent" is force. But any

force, however infinitesimal, will suffice if it is efficient in producing the harmful result. A bacillus, if it enter the system with injurious results, moves from some force, however infinitesimal. The force that enables virulent bacilli to enter the system is itself the efficient external cause of an internal result, septicaemia. Noxious gas in the atmosphere has been held to be a violent agency, in the sense that it works upon the insured so as to cause death. (*Paul v. Travelers' Ins. Co., supra.*) The words ''external'' and ''violent'' were inserted in the contract to protect the company against hidden or secret diseases. One definition of ''violent'' is ''unnatural,'' and in using the word ''violent'' the company was but attempting to prevent the insured from asserting a claim when the injury or death was the result of some natural cause. (*American Acc. Co. v. Reigart,* 94 Ky. 550, [42 Am. St. Rep. 374, 21 L. R. A. 651, 23 S. W. 191].) Hence it has been held that where death or injury is the result of accident, and, therefore, is unnatural, there necessarily is an external and violent agency as a cause of the death or injury. ''That a death is the result of accident, or is unnatural, imports an external and violent agency as the cause.'' (*Paul v. Travelers' Ins. Co., supra.*)

[9] It is contended by respondent that, according to the allegations of the complaint, the insured died of a disease, namely, blood poisoning. Though blood poisoning may have been the immediate cause of the death, it also appears from the complaint, in substance and effect, that the death was effected through external, violent, and accidental means, independently of all other causes, and the blood poisoning was but the result of such external, violent, and accidental means. Blood poisoning, or septicaemia, is, it is true, a disease. But even though disease be the immediate cause of the death, nevertheless, where, as here, it can be seen from the facts, as alleged, that the disease is a mere link in the chain of causation between the accidental means and the death which it produces, it is not an intervening and independent cause, and the death must be regarded as due to the accidental means as the *causa causans.* In short, if it can be shown that the original cause to which the disease can be traced was an ''accidental means,'' then, not the disease, but the original accidental means will be deemed to be the true cause of the death. ''If the accidental injury

produces morbid change in the exercise of vital functions, which in turn results in death, the injury and not the morbid change is held to be the cause of death." (*Clarke* v. *New Amsterdam Cas. Co.*, 180 Cal. 76, [179 Pac. 195].) It is held, therefore, that if inoculation with disease-producing germs is a part of the accident, the accident is, in law, the sole and proximate cause of the death, though blood poisoning ensue. (*Western Com. Travelers' Assn.* v. *Smith, supra; Omberg* v. *United States Mut. Acc. Assn., supra; Central Acc. Ins. Co.* v. *Rembe,* 220 Ill. 151, [110 Am. St. Rep. 235, 5 Ann. Cas. 155, 5 L. R. A. (N. S.) 933, 77 N. E. 123]; *Bailey* v. *Interstate Cas. Co.,* 8 App. Div. 127, [40 N. Y. Supp. 513].)

Respondent has cited a number of "sunstroke" cases. Among others, *Sinclair* v. *Insurance Co.,* 3 El. & El. 478, and *Dozier* v. *Fidelity & Cas. Co.,* 46 Fed. 446, [13 L. R. A. 114]. Sunstroke is a disease. It is a disease that not unusually follows from exposure to excessive heat. One who voluntarily exposes himself to the atmospheric conditions that ordinarily cause sunstroke cannot claim that his condition is due to accident or to accidental means. Says Chief Justice Cockburn in the Sinclair case: " . . . If, from the effects of ordinary exposure to the elements, such as is common in the course of navigation, a mariner should catch cold and die, such death would not be accidental; although if, being obliged by wreck or other disaster to quit the ship and take to the sea in an open boat, he remained exposed to wind and cold for a time, and death ensued therefrom, the death might properly be held to be the result of accident." A like distinction is made in *Northwest etc. Assn.* v. *London etc. Co.,* 10 Man. L. Rep. 537. There the insured froze to death on a prairie in consequence of the accidental breaking down of a conveyance, together with a sudden and unexpected change in the weather to great severity; and it was held that the death was caused by external, violent, and accidental means. Sunstroke does not, as is commonly supposed, come like a stroke of lightning from a piercing ray of the sun. It is a pathological condition. The conditions under which the human system may be affected by it belong to natural causes which may reasonably be anticipated, as they come not by chance. It is a result that ordinarily and naturally follows from a known cause; and

disease produced by a known cause, to which one has knowingly and voluntarily exposed himself, cannot be considered as accidental. (*Dozier* v. *Fidelity & Cas. Co.,* *supra.*)   The case before us bears no analogy to the "sunstroke" cases.   One who voluntarily exposes himself to atmospheric conditions that ordinarily and naturally cause the disease known as sunstroke is not exposing himself to a hidden, but to a known, danger.   In the case before us, if the allegations of the complaint be true, the insured unintentionally exposed himself to a hidden, unknown, and unexpected danger.

[10] There is a marked distinction between a voluntary act and a voluntary exposure to danger.   The act done may be voluntary, but it cannot imply a voluntary exposure to the danger that turns out to be the real efficient cause of the death or injury, unless the danger is known and realized.   Says the court in *Burkhard* v. *Travelers' Ins. Co.,* 102 Pa. St. 267, [48 Am. Rep. 205]: " . . . a great distinction exists between a voluntary act and a voluntary exposure to danger.   Hidden danger may exist; yet the exposure thereto without any knowledge of the danger does not constitute a *voluntary* exposure to it.   The approach to an unknown and unexpected danger does not make the act a voluntary exposure thereto. . . . The act may be voluntary, yet the exposure involuntary.   The danger being unknown, the injury is accidental."   A good illustration of a case of hidden danger where the insured was held entitled to recover, notwithstanding his own voluntary act exposed him to the danger, is afforded by the case of *Lovelace* v. *Travelers' Protective Assn.,* 126 Mo. 104, [47 Am. St. Rep. 638, 30 L. R. A. 209, 28 S. W. 877].   Lovelace, the insured, was shot by a drunken and boisterous man whom he was attempting to eject from a hotel office.   The court held that the death of Lovelace was an accident, and not a risk voluntarily assumed, inasmuch as he had made the attempt to eject the other by force without knowing that the other was armed.   So here, the danger that lurked in the dental instruments was not known to the insured; it was a hidden danger, to which the insured exposed himself without any knowledge of its dangerous character and without reason to suspect its existence.   Indeed, the danger was not known to anyone; nor, accord-

ing to the allegations of the complaint, could it have been foreseen by anyone, and the insured's contract therewith, though it was the means that resulted in his death, was without his foresight, expectation, design, or voluntary act. It is true that the insured's submission to the dental operation was his voluntary act; and his agent, the dentist, doubtless used the instruments in the insured's mouth exactly as he intended to use them; but it does not therefore follow that, in the eye of the law, the death was the result of the voluntary act of the insured. Practically speaking, every injury produced by accidental means may be traced in some line of causation to the voluntary act of the victim. For example, he is a hunter, and is wounded or killed by the explosion of his gun; or he is a carpenter, and the ladder on which he climbs slips and breaks, precipitating him to the ground; or a surgeon or embalmer, and his instrument slips and wounds his hand, inducing fatal blood poisoning. In each of these instances, the result would not have taken place had the person suffering the injury not voluntarily done an act that placed him in the position where he received the harm complained of. And yet we are satisfied no court would give ear to the plea that the injury was not caused by accidental means. In the case before us, the insured's death was the result of exposure to danger. But because the exposure was without knowledge of the danger and the result was not the usual and probable consequence from the use of dental instruments—if the allegations of the complaint be true—it cannot be said that the death was due to the insured's voluntary act or voluntary exposure to danger.

For these reasons we think the complaint was sufficient to repel the defendant's demurrer, and that the judgment should be reversed, with directions to overrule the demurrer and grant defendant leave to answer, should it be so advised. It is so ordered.

Sloane, J., and Thomas, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 11, 1920.

All the Justices, except Olney, J., concurred.