[S. F. No. 11500. In Bank.—February 29, 1928.]

FANNIE MOORE, Respondent, v. THE FIDELITY AND CASUALTY COMPANY OF NEW YORK (a Corporation), Appellant.

466

Chickering & Gregory and Redman & Alexander for Appellant.

W. C. Sharpsteen and Hartley F. Peart for Respondent.

Pillsbury, Madison & Sutro and Eldred Boland, *Amici Curiae*.

RICHARDS, J.—This appeal is from a judgment in favor of the plaintiff in an action instituted by her for the recovery of the sum of five thousand dollars alleged by her to be due from the defendant upon a policy of accident insurance issued by it to one Mary Evelyn Moore, deceased, and of which policy the plaintiff, mother of said deceased, was

the beneficiary. Mary Evelyn Moore was a graduate nurse, having graduated from the University of California Medical School and Hospital on February 11, 1919, and having practiced her profession as such nurse until the time of her death, on February 6, 1922. On November 17, 1920, there was issued to her by the defendant herein the accident insurance policy upon which the plaintiff seeks recovery. Said policy was in the form required by the statutes of California (Stats. 1917, p. 957), which prescribe a standard form for such policies and require a brief description of the nature of the policy to be clearly printed upon the first page thereof. ■ The policy in question accordingly contained in clear type upon its first page the statement that it was a "Business Women's Disability Policy," and this was followed by a brief statement as to the bodily injuries the holder was to be insured against. It was therein provided that the holder of the policy was to be insured against "bodily injury sustained through accidental means and resulting in disability, dismemberment, loss of sight, or death." The body of the policy contained certain limitations upon the foregoing provision which are not necessary to be noted here. In her application for such policy the assured was required to state and did state her occupation to be that of a "private nurse (graduate)" and also to set forth the place of her location and the duties of her occupation as well as the facts relating to her age, habits of life, state of health, etc. In the body of the policy it is expressly stated that it is issued in consideration of the statements made in the said application, a copy of which is indorsed upon and made a part of the policy. The assured's occupation is also expressly stated in the policy as being that of a "Private nurse (graduate)" and the duties of her occupation are described as being "Nurse, not of the insane." The assured's occupation is also therein stated as being "Classified by the company as 'preferred.'" The policy further provides that "Blood-poisoning resulting directly from a bodily injury shall be deemed to be included in said term 'bodily injury.'" ■ The meaning of the designation "graduate nurse" is to be found in the terms of the Statutes of 1913, page 613, which is entitled "An act to promote the better education of nurses and the better care

of the sick in the state of California, to provide for and regulate the examination and registration of graduate nurses, etc.'' In section 4 of said act a graduate nurse who is eligible for examination and registration as a registered nurse is one who shall ''furnish satisfactory evidence of having been graduated from an accredited training school for nurses. An accredited training school for nurses within the meaning of this act is hereby defined to be a school for the training of nurses attached to or operated in connection with a hospital or hospitals giving a general training and a systematic theoretical and practical course of instruction covering a period of at least three years.'' In view of the foregoing terms of the assured's application for this policy and of the terms of the policy itself, which define it as a ''Business Women's Disability Policy,'' and of the several designations of the assured's occupation as being that of a graduate nurse, and of the statutory definition of that term, it may not be here contended that the insurer in issuing to the insured said policy did not intend to insure her against the occupational risks of her profession as a graduate nurse and was not fully aware of the hazards of her particular calling. ■ The only limitation placed upon the liability of the insurer arising out of these occupational hazards was that the injuries occurring in the course of such occupation should be ''bodily injuries'' and that these should be sustained ''through accidental means'' in order to give rise to such liability. The foregoing are important considerations for the reasons, first, that what are to be considered as ''bodily injuries,'' as the term is used in said policy, must be interpreted in the light of the occupation of the assured; and, second, that what are ''accidental means'' must also be interpreted in the light of said occupation and of the peculiar risks or hazards which are the incidents of its exercise; and in the light also of the safeguards with which modern science has surrounded the care of the sick in hospitals through the use of the expert skill and precautionary knowledge of physicians and nurses in the present day and age. ■ The insurer issuing this policy to the insured, knowing that her occupation was that of a graduate nurse, must be presumed to have known the nature, character, incidents, and hazards of such occupation

and to have had these in mind in the use of the terms employed in its policy, and if there was any branch of such occupation which was considered extrahazardous it should have been excluded from the coverage of the contract. (*Yoch* v. *Home Mutual Ins. Co.*, 111 Cal. 503 [34 L. R. A. 857, 44 Pac. 189]; *Sims* v. *State Ins. Co.*, 47 Mo. 54 [4 Am. Rep. 311]; *Dudley* v. *Preferred etc. Assn.*, 102 Mich. 289 [26 L. R. A. 171, 57 N. W. 184]; *Interstate etc. Assn.* v. *Lester*, 257 Fed. 225.) ■■■ The insurer in fact did exclude from the protection of its policy certain specific bodily injuries by the terms of article 18 thereof, reading as follows: "This policy does not cover any bodily injury fatal or non-fatal—(1) resulting from fighting or from any military or naval service; (2) received by the assured while or in consequence of being or having been under the influence of or affected by intoxicants; (3) intentionally inflicted upon the assured by herself; (4) inflicted upon the assured while participating in, or in consequence of having participated in aeronautics." It also apparently excluded whatever duties the assured in her occupation as a graduate nurse should undertake in the way of nursing the insane. It must therefore be presumed that the insurer had in mind in the issuance of this policy the fact that one of the ordinary hazards to which a graduate nurse would be exposed in the exercise of her calling was that of exposure to the possibility of infection in the care of patients afflicted with communicable disorders, and that it intended that she should be insured against this hazard by its failure to include it among the risks against which it did not undertake to insure. It may be further said in this very connection that the insurer, after setting forth in its policy the foregoing exceptions, expressly classified the assured's occupation as "preferred," and by the fact of so doing indicated that it did not consider the ordinary hazards of her occupation other than those expressly excepted as being beyond the protection of its policy, since to hold otherwise would be practically to hold that the assured, while pursuing her vocation, was to be given no protection at all. ■■■ With respect to the term "bodily injuries" as employed in this policy we are somewhat enlightened as to the meaning which the parties thereto assigned to it by the clause therein which

provides that "blood-poisoning resulting from a bodily injury shall be deemed to be included in said term"; but even without the aid of that provision we are of the opinion that in the light of the authorities there can be but little if any doubt that infection caused by contact with the germs of a communicable disease constitutes a "bodily injury" within the usual meaning of that term as the same is employed in compensation laws and insurance policies. In the case of *San Francisco* v. *Industrial Acc. Com.*, 183 Cal. 273 [191 Pac. 26], it was held that influenza contracted by a hospital steward from patients in the course of his employment was a bodily injury. So, also, in the case of *Horton* v. *Travelers etc. Co.*, 45 Cal. App. 462 [187 Pac. 1070], it was decided that streptococcic germs introduced into the mouth of a patient by means of polluted dental instruments causing blood poisoning, was a bodily injury within the meaning of that term as used in an accident insurance policy similar to that involved in the instant case. So, also, it has been held in not a few cases that typhoid fever germs introduced into the system through the drinking of polluted water constituted a bodily injury within the meaning generally of policies of accident insurance. (*Aetna etc. Co.* v. *Portland, etc.*, 229 Fed. 552 [L. R. A. 1916D, 1027]; *Christ* v. *Pacific etc. Co.*, 312 Ill. 525 [35 A. L. R. 730, 144 N. E. 161].) From the standpoint of pure reason, whether bodily injury which produces a weakening or disintegration of the physical system is caused by flying germs or by flying shrapnel or by a poisoned arrow or by the sting of an insect is only a matter of degree as to the size or quality of the missile or instrumentality inflicting the injury.

As to the term "accidental means" as used in such policies, the authorities also shed light upon its signification. In the case of *Horton* v. *Travelers Ins. Co., supra,* the term "accidental means" is held to be descriptive of "means which produce effects which are not their usual or probable consequences." In the case of *Richards* v. *Travelers Ins. Co.*, 89 Cal. 170 [23 Am. St. Rep. 455, 26 Pac. 762], the term "accident" is defined as "a casualty; something out of the usual course of events but which happens suddenly and unexpectedly and without any design of the person injured." In the case of *Rock* v. *Travelers Ins. Co.*, 172 Cal. 462–465

[L. R. A. 1916E, 1196, 156 Pac. 1029], it was pointed out by this court that the accident policy in that case did not insure against accidental death, but against death through accidental means; the court saying: "It is not necessary that the death or injury should be unexpected or unforeseen, but there must be some element of unexpectedness in the preceding act or occurrence which leads to the injury or death." The case of *State* v. *Allison*, 269 Fed. 93 [14 A. L. R. 412], while not identical with this one as to the nature of the bodily injury inflicted, is quite apposite in its discussion as to the meaning to be attributed to the term "accidental means." The assured in that case was killed in battle in France. His policy insured him against death resulting from bodily injury sustained and effected directly through external violent and *accidental means*. The only exceptions in the policy were "murder or suicide, sane or insane not included." The court in holding that the assured came to his death by external and violent means which were to be regarded as "accidental means," as far as he was concerned, said: "Experience convincingly teaches that the hazards incident to many lawful employments other than war are such that it is to be expected that some of those engaged therein will be injured or killed. If an accident policy contains no provision excepting such hazards, and by chance, without the insured's design, consent or co-operation, he is injured or killed as a result of a hazard incident to his occupation, his injury or death properly may be said to have been caused by accidental means. While it was to be expected that some of the soldiers engaged in the military operation in which the insured was engaged when he was killed would be injured or killed, it is not to be denied that it was by chance that Lieutenant Allison's person was in the path of the piece of shrapnel which caused his death. He would not have been injured or killed by that missile but for the accidental or fortuitous circumstance that his person happened to be in its path. It was chance which determined that he was the soldier who was the victim of that stray missile. . . . Whether the injury or death of a particular soldier is a consequence of his participation in a battle ordinarily depends on his happening to be, or not to be, in the path of a missile of war. It cannot well be said

that the wounding or killing of any particular soldier belonging to a force going into battle is so far a natural and to-be-expected consequence of his so being exposed to danger as to prevent a casualty happening to him properly being regarded as within the category of accidents.'' When these several but harmonious definitions of the foregoing phrase are considered it will at once be apparent that the term ''accidental means'' depends for its application upon the facts of each particular case; since what would be an unusual or improbable consequence, an unexpected or unforeseen occurrence in one set of circumstances in which the assured might be placed would be but the usual, the expected and in all human probability the foreseen consequence affecting the assured in another set of circumstances. This reasoning has especial application to accident insurance, and particularly to the sort of occupational accident insurance with which we are concerned in the instant case; for it must be apparent that while the result of the exposure of the ordinary or unsafeguarded individual to the infection of a virulent, communicable disorder would have as its usual and expected consequence infection and the contraction of the disorder, such would not be at all, or at most, the unusual, improbable, and unexpected consequence of the exposure of the experienced and safeguarded physician or nurse in a modern hospital to the same disorder. The insurer in the instant case in the acceptance of this risk and the issuance of this policy to the insured, knowing the occupation in which she was and was to be engaged, must be held to have contracted with the foregoing facts, grounded in human experience, in view; and hence to have contemplated as embraced within the phrase ''accidental means'' the possible hazard of infection from such contagious or communicable disorders as it might fall to the lot of this graduate nurse to treat in the usual course of her calling. In point of fact, were the rule of interpretation of this clause in accident policies that insisted upon by the appellant herein, the elements of skill, watchfulness, and the use of preventives against contagion which in modern hospitals render infection, especially among physicians and nurses, a rare and unusual occurrence, would only serve to defeat a recovery upon such a policy by furnishing evidence that the hazard of infection was in every

such case expected and foreseen. The result would inevitably be that physicians, hospital attendants and nurses would be beyond the pale of protection under the terms of accident policies such as is presented in the case at bar.

Having thus cleared the way for a review of the circumstances of the particular case as educed at the trial, we find the following to be the practically undisputed facts of the instant case: The assured, Mary Evelyn Moore, was, at the time of the issuance to her of this accident policy, a graduate nurse who, for the period of three years prior to February 4, 1922, had been actively engaged in the practice of her profession. At the time of her engagement on the above date to attend one Walter J. Hesse, a patient in the University of California Hospital, as a day nurse, she was, according to the testimony of the physicians and other persons who knew her, "a large, robust and very healthy looking woman" of the age of thirty years, and was one who "made the impression of being exceptionally strong and having a good physique." She was thus exceptionally qualified to resist infection from communicable disorders. As to her habitudes as a nurse, with respect to precautions taken by her to avoid infection in the treatment of patients committed to her charge, her roommate, Mrs. Allen, who was also a nurse and was frequently associated with her in the nursing of patients, testified that "she was extremely careful and often on cases she didn't know even to be infectious she would go to the dressing room and gargle her throat every little while. She took these precautions more frequently than I would and many of the other nurses; more frequently than I thought was really necessary. It was her habit to do that." Dr. Lisser testified: "She had nursed a number of my cases during this period of two years that I testified to that I knew her as a nurse. From my observation in the two years she nursed for me from time to time she certainly observed the usual precautions so as to protect her own health when in attendance upon patients where carelessness on her part might affect herself." The foregoing testimony was uncontradicted and would seem to be sufficient to justify the inference that in the exercise of her duties in the care of the patients entrusted to her on that and the following days she made use

of those precautions to which she was habituated in order
to avoid injury from infection to herself. The patient, as
it later appeared, was suffering from a streptococcic infec-
tion scientifically known as streptococcus hemalyticus and
popularly known as blood poisoning. This infectious dis-
order, according to the testimony of the physicians, is fairly
common and can be communicated from an infected person
through inhalation by another of the infected organisms
exhaled by the infected person. The attendance of the
nurse upon her patient began in the morning of the day
of her employment. There is no evidence as to just when
she became informed of the dangerous nature of her patient's
disorder, but there is evidence that the physician in charge
of the case was not sure that it was a case of streptococcic
infection until late in the afternoon of that day, when the
laboratory reports were received. It cannot in reason be
assumed that the nurse would know more or be informed
earlier than the physician as to the dangerous nature of the
case or that she was or would have been put upon notice
of the need of extraordinary precautions for her own safety
prior to the time late in the afternoon of the first day when
Dr. Berwick upon receiving the laboratory tests and being
thus for the first time definitely informed of the danger
of infection instructed her to take precautions to protect
herself from becoming infected. There is evidence in the
record that on the evening of that day the insured told her
roommate that "she was afraid of this case that she was
on, the Hesse case, and she was complaining of a chill and
she was afraid of it." This evidence only tends to show
that at some time during this first day she had caught the
infection and the probabilities would seem to be that it was
prior to the time late in the afternoon when she was for
the first time informed by the physicians as to the dangerous
and infectious nature of her patient's malady. There is
certain other evidence in the case which has an important
bearing upon the question as to whether the insured's con-
traction of this infectious disease was the expected or unex-
pected, the usual or unusual consequence of her exposure
to infection. This evidence shows that during this first day
of the patient's admission to the hospital numbers of per-
sons came and went through the room in which he was lying

and that none of these, with the exception only of this nurse, contracted his disorder. The physicians in charge of the case, the relations and friends of the patient; his brother, the brother-in-law of his sister, her sister-in-law and her husband, a friend and her daughter; and last but not least the sister and also the fiancée of the patient who were with him day and night, the former of whom "sat close enough to him to hold his hand"; and the latter of whom hung over him almost constantly kissing and fondling him until finally warned by the physician to desist. The fact that none of these persons who, with the exception of the physicians, was safeguarded by no precautions and who exercised none of the nurse's habitual and expert care in the avoidance of infection, did not become infected furnishes cogent evidence tending to show that the danger of infection was not the usual or probable or expected consequence of exposure to the patient's communicable disorder but was, especially in the case of this careful, skilful, experienced, and unusually cautious nurse an altogether unexpected and unusual consequence—a casualty in fact from the direct effect of which she came to her death. ■ There is also present in the record the evidence of the physician in charge that the patient was subject to sudden, unexpected, and explosive fits of coughing during which the patient was delirious, and during which the germs of his disease would be propelled into the face of anyone who might be bending over him. Both the patient and the nurse are dead and we have no means of knowing under just what conditions or at what moment the faithful nurse received into her system the germs which caused her infection; but since the only assault which the appellant herein makes upon the judgment of the trial court is that the findings upon which it is based are not supported by the evidence, we are entitled to indulge in every reasonable inference which may be drawn from the uncontradicted evidence in the case in support of the findings and judgment of the trial court; and from the facts as above set forth showing that the assured was an educated, experienced, skilled, and habitually and unusually careful nurse, and from the fact she was not informed by the physicians in charge as to the virulent nature of her patient's disorder until late in the afternoon of her first day's at-

tendance upon him; and from the fact that the patient was subject to sudden, unexpected, spasmodic, and explosive fits of coughing, which would propel the germs of his disease into the face of one who might at the time be ministering to him in his delirious and semi-conscious condition, we are of the opinion that the inference is a reasonable one to be drawn from such evidence that it was in some such unexpected paroxysm of the patient that the germs carrying infection were communicated to the assured, notwithstanding her professional and habitual precautions. The appellant herein assails the doctrine declared in the case of *Horton* v. *Travelers etc. Co., supra,* in so far as it is decided therein that the introduction into and action of disease-bearing bacteria upon the tissues of the human system constitutes a bodily injury within the meaning of that term as used in accident insurance policies. We are, however, satisfied with the scientific and legal correctness of the doctrine declared in that case and of the exact application thereof to the facts of the case at bar. ■■■ The appellant also makes the contention that the fact that the deceased nurse did not wear a gauze mask while in attendance upon her patient negatives the implied finding of the trial court that the nurse properly performed her functions as a careful and skilful nurse; but upon this matter the evidence is quite in conflict as to whether the wearing of a gauze mask affords any substantial protection to doctors and nurses in cases of communicable disorders; and this being so the findings and judgment of the trial tribunal ought not for that reason be disturbed. We have carefully examined the cases cited by the appellant in support of its contention that injuries sustained by physicians and nurses from contact with infectious diseases are not to be held to have been sustained by "accidental means," but we find among these no case wherein recovery upon facts at all similar to those herein presented was denied, unless it appeared as a basis for such denial, either that the policy expressly exempted the insurer from liability for bodily injuries happening either directly or indirectly in consequence of disease, or in which the terms "external" and "violent" as applied to injuries, and which are omitted from the present policy, were embraced in the policies there under review, and were not met by the proofs. An example

of the first of the foregoing class of cases cited by the appellant is the case of *Bacon* v. *United States etc. Assn.*, 123 N. Y. 304 [20 Am. St. Rep. 748, 9 L. R. A. 617, 25 N. E. 399], and an example of the other class which the appellant also relies upon are the cases of *Smith* v. *Travelers etc. Co.*, 219 Mass. 147 [L. R. A. 1915B, 872, 106 N. E. 607], and *Zock* v. *Fidelity etc. Co.* (Mo. App.), 272 S. W. 99. The only exception we have noted to these inapplicable citations is that of the case of *Ramsey* v. *Fidelity etc. Co.*, 143 Tenn. 42 [13 A. L. R. 651, 223 S. W. 842], which it is conceded is in direct conflict with the Horton case. While in the foregoing opinion we have not undertaken to expressly cite and comment upon all of the cases cited by respective counsel in their several briefs, we feel that we have fairly covered and considered the main and controlling questions at issue upon this appeal.

The judgment is affirmed.

Preston, J., Langdon, J., Seawell, J., and Curtis, J., concurred.

SHENK, J., Dissenting.—I dissent. The only question in this case is whether the insured came to her death as the result of bodily injury suffered through accidental means. The terms of the policy in this respect are plain and unambiguous. This policy, however, is dual in its engagements. It is a business women's disability policy and as such is subject to the construction placed upon it by the main opinion as having been issued by the insurer with full knowledge of the hazards of the occupation of the insured. In its other aspects the policy is an ordinary contract for indemnity for death resulting from bodily injury suffered through accidental means. It is with this second aspect of the policy that the court is now concerned. Whether the insurance company knew or did not know of the hazards of the insured's employment is of no consequence (in the absence of fraud or concealment, which are not involved here), so long as the insured came to her death as a result of bodily injury suffered through accidental means. The main opinion, it seems to me, has confused these two plainly separable and independent phases of the policy.

I cannot agree that the entrance of a germ into the human body, unaccompanied by any abrasion or traumatic condition or physical interposition, and causing sickness and death, is a bodily injury as contemplated by the insurance policy involved in this case. The language of the policy is not unique, but follows generally the language of standard health and accident policies. The effect of the opinion in this respect is that a disease-bearing germ introduced into the respiratory tract by inhalation by anyone while in a public conveyance, on a public street, in a place of public amusement, in his own home, in fact any place where human beings are closely enough in contact to be within the zone of contagion and unaccompanied by any abrasion or trauma or physical interposition, is a bodily injury. In my opinion this holding is introducing into the realm of accident insurance a false quantity not contemplated by the insurer or insured and by judicial fiat has converted the accident insurance contract into one of health insurance if the insured survive, and into one of life insurance in case of death. If such had been the law during the days of the influenza epidemic following the close of the world war, it is not difficult to imagine what would have happened to accident insurance companies. Claims for indemnity on account of death from that and other contagious diseases under accident insurance policies have not been made for the reason that such an application of the term "bodily injury" was never intended. This novel application of the term has not been made in this state, nor, in my opinion, in any other jurisdiction where the point was directly involved. The case of *Horton* v. *Travelers Ins. Co.,* 45 Cal. App. 462 [187 Pac. 1070], did not go to the length accredited to it in the main opinion. That case involved the sufficiency of the complaint on a policy almost identical with the present one, wherein it was alleged that by the unintentional use of infected dental instruments, virulent disease-bearing germs were introduced into the system of the insured. A natural and ordinary result of the use of dental instruments is an abrasion of some of the tissues of the oral cavity and such use is always accompanied by some manual interposition. The allegations of the complaint in that case must have been considered in the light of a matter of such common experience. Nor does the case of *San Fran-*

*cisco* v. *Industrial Acc. Com.*, 183 Cal. 273 [191 Pac. 26], support the construction placed on the term "bodily injury" by the main opinion. In that case it was decided that the definition of the term "injury" by the legislature in section 3 of the Workmen's Compensation Act; as adopted in 1917 (Stats. 1917, p. 833), was a definition justifiable under the constitutional provision providing for workmen's compensation. The legislature defined the term as follows: "The term 'injury,' as used in this act, shall include any injury or disease arising out of the employment." To hold that the special statutory definition of the term "injury" made for the purpose of putting into effect the workmen's compensation provision of our constitution should be applied to the term "bodily injury" as used in accident policies is, in my opinion, unwarranted.

Furthermore, as to the particular facts in this case, I am unable to agree that in the contraction of the disease by the insured there was that element of unexpectedness and surprise essential to prove death by "accidental means." The term "accident," as used in similar policies, has been given a definition in this state that is uniform and without substantial deviation. The term is defined as "a casualty— something out of the usual course of events, but which happens suddenly and unexpectedly and without any design of the person injured." (*Richards* v. *Travelers Ins. Co.*, 89 Cal. 170. [23 Am. St. Rep. 455, 26 Pac. 762]; *Price* v. *Occidental Life Ins. Co.*, 169 Cal. 800 [147 Pac. 1175]; *Southwestern Surety Ins. Co.* v. *Pillsbury*, 172 Cal. 768 [158 Pac. 762]; *Olinsky* v. *Railway Mail Assn.*, 182 Cal. 669 [14 A. L. R. 784, 189 Pac. 835].) It must be borne in mind that the policy here in question does not insure against accidental death, but against death through accidental means. "A differentiation is made, therefore, between the result to the insured and the means which is the operative cause in producing this result. It is not enough that death or injury should be unexpected or unforeseen, but there must be some element of unexpectedness in the preceding act or occurrence which leads to the injury or death." (*Rock* v. *Travelers Ins. Co.*, 172 Cal. 462, 465 [L. R. A. 1916E, 1196, 156 Pac. 1029, 1030].) An unbroken line of cases to this same effect is found in this state.

In the present case the means through which the fatal malady was contracted by the insured was neither unusual nor unexpected. There was no element of surprise in coming in contact with the virulent organisms. In fact, such contact was foreseen and expected. The insured knew and realized the dangers incident to the performance of her duties as an attending nurse and by gargling, washing her hands, etc., took precautions to guard against the effect of the exposure. The fact that others similarly exposed did not contract the disease is not sufficient to prove that the insured contracted the same by accidental means. If the other persons present in the room from time to time had contracted the malady, there would have been no element of surprise or unexpectedness or of the unusual in so contracting the same, for they were all advised and warned of the danger to them by reason of their presence in the room. That such other persons did not fall a prey to what was an expected and anticipated contact with the germs would show no more than that their resistance was greater than that of the assured. Effect must be given to the plain language of the policy and a distinction made between the result to the insured and the means by which that result was brought about. It may be said that the result to the assured, namely, illness and death, was unexpected and unintentional; but that is far from saying that the means that produced the illness and subsequent death were unexpected, unusual, or not anticipated. If the insured had suffered an accident or disability by illness from any cause and had survived, indemnity for the same would have accrued under the disability terms of the policy. But to say that because this disability was provided for in contemplation of her occupation as a nurse therefore a death benefit would accrue when death was the result of an occupational hazard is entirely to disregard the separate and independent terms of the policy relating to indemnity for death as the result of bodily injury through accidental means.

Waste, C. J., concurred.

Rehearing denied.

Waste, C. J., and Shenk, J., dissented.