[Civ. No. 4706. Third Appellate District.—January 21, 1933.]

JESSIE V. TRUEBLOOD, Respondent, v. MARYLAND ASSURANCE COMPANY OF BALTIMORE (a Corporation) et al., Appellants.

John Ralph Wilson and Hawkins & Hawkins for Appellants.

Francis O. Hoover for Respondent.

THOMPSON (R. L.), J.—The widow and beneficiary of H. A. Trueblood, deceased, obtained a judgment for $7,500 upon an insurance policy, for the death of her husband which resulted from bodily injuries sustained through accidental means. The insurance company denies liability for two reasons. It asserts that death did not result from bodily injuries received exclusively through accidental means, and that the policy was invalidated by refusal to permit an autopsy upon the remains of the deceased for the purpose of ascertaining the cause of death.

For ten years the deceased had carried an accident policy with the Maryland Assurance Company of Baltimore. That policy was in force at the time of his death. In consideration of an annual premium of $25 the corporation insured the deceased "against loss resulting from bodily injuries, including death resulting therefrom, effected independently and exclusively of all other causes directly through accidental means". It also provides: "The corporation shall have . . . the right and opportunity to make an autopsy in case of death where it is not forbidden by law."

On July 13, 1930, the deceased, in company with several other persons, was engaged in swimming in an irrigation canal near Modesto. The canal was constructed with a drop of about three feet in the bed thereof just below the point where the parties were bathing. At the point of this depression concrete wings existed on either side of the canal, and weir boards were inserted across the narrowest portion of the stream to retard the flow and back up the water for irrigation purposes. Above the dam the water was about three feet in depth. It flowed over the weir boards with great velocity, creating a dangerous whirlpool and undertow. The water was six feet in depth below this drop in the bed of the stream. At this point a narrow footbridge extended across the canal. It was supported in the center by two upright iron rods.

The deceased was forty-four years of age. He weighed 180 pounds. He had a ruddy complexion. He was apparently in good health and vigor. There is no evidence that he was previously afflicted with any physical ailment. At the time of the accident he was standing above the weir boards beneath the bridge in the shallow water bracing himself against the rapid current and clinging to one of the upright iron rods. John Beard, another bather, stood at this point clinging to the other upright rod. Mrs. Abbott came swimming down the canal to the bridge. She was swept along by the rapid current. All witnesses agree the water was rushing over the obstruction into the whirlpool with great velocity. The deceased warned her against the danger of the current and the depth of the pool. As she came near to Mr. Trueblood he extended his hand in an apparent effort to prevent her from being swept into the whirlpool below. Some witnesses say she caught hold of his arm. Others did not observe this act or see that he managed to reach her. She was swept over the dam. Mrs. Abbott testified in that regard: "I was facing down stream. It was the extreme current that forced me over the drop. . . . May I explain that the water was boiling. . . . There was a whirlpool that would drag one down. . . . I was not able to swim against the whirlpool." She was carried under the water several times by the force of the whirlpool. In an exhausted condition she was finally rescued by her husband some distance below the dam.

It appears that the deceased released his hold on the upright bar to which he was clinging, and in reaching out to prevent Mrs. Abbott from being swept over the dam, he lost his balance and fell into the whirlpool below. Mr. Bond testified: "Mr. Trueblood reached out to help her (Mrs. Abbott) and went over at the same time and they both disappeared under the water." Mr. Beard testified: "There was a very strong current in the stream there. . . . Mr. Trueblood was holding onto the standard, Mrs. Abbott . . . came downstream and either took ahold of Mr. Trueblood's arm or Mr. Trueblood reached out and took hold of Mrs. Abbott's arm. . . . The next thing I noticed was Mrs. Abbott going over the drop, and following her immediately, before she was even out of my sight, Mr. Trueblood went. . . . They went over in . . . a falling position, sidewise.

. . . I recall noticing him struggling . . . in the backwash. . . . I saw that he . . . seemed to be having a terrible struggle. . . . He had a very frightened panicky expression on his face. . . . He was struggling desperately and very inefficiently against the backwash." The evidence does not indicate that he attempted to reach Mrs. Abbott or assist her after he fell over the dam. Regarding the accident which caused the deceased to lose his balance and fall into the whirlpool, Mrs. Trueblood, the wife of the deceased, who sat upon the bank of the canal and witnessed the incident, testified: "He was 44 years, 5 months and 17 days of age. He had always been in very good health. He never complained of any difficulty and he always attended to his business and seemed normal in every respect, never subjected to any seizures or complaint of any sort. About a year after we were married he took out a life insurance policy and had a physical examination. . . . I saw my husband and Mrs. Abbott go over the drop in the canal. . . . When Mrs. Abbott reached him . . . he let go of the support but seemed to brace himself and put out his other hand as though to warn her and she shot over the falls. Then he fell sideways as he went over the falls." After a severe battle with the swift current, the undertow and the whirlpool, he finally reached the bank and was pulled from the water in an exhausted condition. After reaching land he collapsed and for some time sat upon the ground slumped over breathless and helpless. Later he was assisted to the rear seat of his automobile where he sat lopped over upon the cushion while his wife drove the car to the home of J. C. Garrison, where the group of swimmers participated in a card party. He did assist in serving refreshments to the guests, and apparently revived to some extent. Everyone present noticed his prostrated condition. He urged his wife to go home early. When they left he undertook to drive the car. They had not proceeded far when he remarked: "We'll have to stop. The lights are getting dim or they have gone out, haven't they?" He then pulled the car on to the shoulder of the highway "drew in a gasping breath and reared clear back against the seat just as hard as he could and then collapsed, fell forward on the wheel," and expired. At the trial of the case, Dr. Gould testified in response to a hypothetical question, "I should say that

this man died of an acute dilatation of the heart, brought about by his sudden and unusual exertion while struggling in the water.'' The coroner certified that the assured died on July 13, 1930, from ''cause of death, natural causes, probably acute dilatation of the heart''.

The court found that he ''died as a result of bodily injuries effected independently and exclusively of all other causes directly through accidental means'', and that the insurance company waived its right to an autopsy by failing to demand it within a reasonable time, not having requested such examination until eight days after his death, notwithstanding the receipt of adequate notice of the accidental death of the assured by letter two days after his demise. Judgment was accordingly rendered against the insurance company for the sum specified in the policy. From this judgment an appeal was perfected. The real issue on this appeal is whether the foregoing findings are sufficiently supported by the evidence.

The evidence furnishes satisfactory proof that the deceased did not voluntarily plunge into the whirlpool below the dam to rescue Mrs. Abbott. On the contrary it appears that he accidentally fell into the pool, and that his violent exertion to extricate himself resulted in acute dilatation of the heart, which subsequently caused his death. There is no evidence that he previously suffered from heart affliction or other organic ailment. On the contrary there is evidence that he was a strong, healthy man who was not afflicted with any functional disease. We are therefore satisfied the findings of the court that the insured ''died as a result of bodily injuries effected independently and exclusively of all other causes directly through accidental means'', are adequately supported by the evidence. He accidentally fell into the whirlpool. His violent resistance against the undertow and current of the whirlpool, to save his life, caused acute dilatation of the heart which resulted in death. The accidental falling into the pool was the direct and necessary cause of the violent exertion which resulted in death. Since there is no evidence of previous organic infirmity, and upon the contrary, since affirmative evidence of his previous strength and health free from functional disease appears, it is reasonable to assume he

died from bodily injuries sustained directly through an accident independently and exclusively of any other cause.

 When death is caused from dilatation of the heart as a direct and immediate result of accidentally falling into a whirlpool of water and the consequent violent exercise of extricating one's self therefrom, it will create a liability under an insurance policy for compensation for death resulting from "bodily injuries . . . effected independently and exclusively of all the other causes directly through accidental causes". The swirling force of the water which required violent struggle to escape from the whirlpool caused bodily injury resulting in death just as effectively as though the victim had been struck by a mighty ocean wave and dashed to the beach or upon some hidden rock. The dilatation of the heart was a mere incident resulting from bodily injury, just as apoplexy following the rupturing of a blood vessel might become incident to traumatic injury. The struggle against the force of the water in the present case became the means by which the bodily injury was inflicted. In the case of *Horsfall* v. *Pacific Mutual Life Ins. Co.*, 32 Wash. 132 [72 Pac. 1028, 98 Am. St. Rep. 846, 63 L. R. A. 425], wherein the policy insured one against death from the effect of bodily injuries caused solely by external, violent and accidental means, it was held the policy created a liability where the insured, who was 58 years of age, with no previously known ailment, died from dilatation of the heart, caused by trying to lift a 350-pound bar of iron. There is no good reason to doubt that death which is caused by the rupture of or fatal injury to an internal organ as the direct and immediate result of violent exercise to save one's self from the undertow and current of a whirlpool in a stream, is caused by bodily injuries, just as clearly as though the victim were killed by the external blow from a hammer or a fist. This construction of the term "bodily injury" has been applied to death resulting primarily from drowning, infection, sunstroke, strain and freezing. (*Kinsey* v. *Pacific Mutual Life Ins. Co.*, 178 Cal. 153 [172 Pac. 1098]; *Horton* v. *Travelers Ins. Co.*, 45 Cal. App. 462 [187 Pac. 1070]; *Moore* v. *Fidelity & Casualty Co.*, 203 Cal. 465 [265 Pac. 207, 56 A. L. R. 860]; *Clarke* v. *New Amsterdam Casualty Co.*, 180 Cal. 76 [179 Pac. 195]; *Elsey* v. *Fidelity & Casualty Co. of N. Y.*, 187 Ind. 447 [120 N. E. 42, L. R. A.

1918F, 646]; *Richards* v. *Standard Ins. Co.*, 58 Utah, 622 [200 Pac. 1017, 17 A. L. R. 1183]; *Lickleider* v. *Traveling Men's Assn.*, 184 Iowa, 423 [168 N. W. 884, 3 A. L. R. 1295]; *Ashley* v. *Agricultural Ins. Co.*, 241 Mich. 441 [217 N. W. 27, 58 A. L. R. 1208].) Liability for death under the provisions of an accident policy similar to the one which is involved in the present case will attach even though the immediate bodily injury results in septicaemia, apoplexy or heart failure as a medium through which death ensues. (*Horton* v. *Travelers Ins. Co., supra.*) ■ It is not necessary that the accidental cause shall leave visible external contusions or abrasions of the body. A bodily injury may be either external or internal. If it becomes the direct exclusive cause of death, it creates a liability. We are satisfied the record discloses substantial evidence of an accident which caused bodily injury to the insured person resulting in death independently and exclusively of all other causes. The finding to that effect is therefore adequately supported by the evidence.

■ The insurance company waived its right to demand an autopsy by failing to request the post-mortem examination until three days had elapsed after the burial of the body had occurred, since the company was notified by letter of the accidental death and the likelihood of the presentation of a claim for compensation which communication the company received two days before the funeral and sent a representative to investigate the cause of death on the day of the funeral. It is immaterial that this notice of death and warning of the presenting of a claim for compensation was given to the company through the medium of its own local agent. The insurance policy was therefore not invalidated by a refusal to permit the autopsy, under the circumstances of this case.

The insured died July 13, 1930. Two days later the Modesto agent of the company wrote a letter addressed to its principal office at San Francisco, which reads in part:

"July 15th, 1930.

"Maryland Casualty Company
 "San Francisco, California.

"Gentlemen:—Re: Policy No. AH2452 Harry A. Trueblood.

"Please be advised that the insured under the above numbered policy passed away Saturday night. The circum-

stances surrounding his death might be considered accidental and we are notifying you in order that you may take the necessary steps under the contract. . . .

"Will you kindly advise what steps are necessary for the beneficiary to take in order to put this claim before you in proper order? . . . "

It was stipulated this letter was received by the insurance company at its office in San Francisco the following day. In response to this letter a representative from the claim department of the company visited Modesto on the day of the funeral, which was July 18th, to investigate the claim, but failed to notify the widow of the deceased, or anyone in her behalf, that an autopsy would be required.

It is true the insurance policy provides that "The corporation shall have . . . the right, and opportunity to make an autopsy in case of death where it is not forbidden by law." It also provides: "Failure to comply with any of the requirements contained herein shall invalidate all claims under this policy." The insurer may, however, waive the foregoing right to a post-mortem examination of the body by its conduct or lack of diligence. An insurance policy may not be invalidated for refusal to permit an autopsy unless the demand therefor is made within a reasonable time after the death. When there is timely notice of death and reason to believe that a claim for compensation therefor will be presented, and ample opportunity to hold an autopsy before the burial of the body, an insurance company may not complain of a refusal to permit the exhuming and post-mortem examination of the body when the request therefor is made for the first time two days after the burial. In 7 Cooley's Briefs on Insurance, second edition, 5895, it is said:

"If the policy contains a provision that an examination shall be allowed of the body of the insured after his death, a demand for such examination must be made within a reasonable time after the death. . . . In determining whether the demand has been made within a reasonable time, special emphasis has been placed on the propriety of making such a request prior, at least, to the burial of the body." (*Wehle* v. *United States Mut. Acc. Assn.*, 153 N. Y. 116 [47 N. E. 35, 60 Am. St. Rep. 598]; *United States Fidelity & Guar-*

*anty Co.* v. *Hood,* 124 Miss. 548 [87 South. 115, 15 A. L. R. 605].)

In the case last cited, it is said: "Provisions of a contract of this kind which are prepared by the insurer are to be construed most strongly against the insurer and in favor of the insured. Where there is no provision in the contract itself giving the right of an autopsy after interment, the court will construe the provisions to mean that an autopsy must be demanded and performed prior to interment, and if the insurer desires to avail itself of this privilege, it must so arrange and provide for information to be given of the death prior to the interment."

Circumstances may arise which will entitle an insurance company to exhume and examine the body of an insured person after burial. When the insurance company has no information regarding the death or the cause thereof until after the body has been buried and there is reason to believe the post-mortem examination will disclose facts which will release the company from liability, it may be just and proper to hold an autopsy even after burial. There are cases which uphold this declaration of law. But when the insurance company has information regarding the death and reason to believe a claim for compensation may be made, within ample time to demand the autopsy before the funeral occurs, the right to a post-mortem examination is waived by failure to make such demand until after the burial has occurred. In the present case the insurance company was notified July 15, 1930, of the death of Mr. Trueblood, and that "the circumstances surrounding his death might be considered accidental and we are notifying you in order that you may take the necessary steps under the contract". In this communication, the insurance company was also requested to "kindly advise what steps are necessary for the beneficiary to take in order to put this claim before you". After the receipt of this information notifying the company that the cause of death "might be considered accidental", accompanied by warning that a claim was likely to be presented by the request for advice as to how the beneficiary might file a proper claim for compensation, three days elapsed before the funeral occurred. A demand for an autopsy by wire or telephone might have been promptly

made from the San Francisco office. A representative could have been sent to Modesto within a few hours after the notice of death was received. Indeed, a representative from the claim department was sent to Modesto on the day of the funeral to make an investigation. No demand for an autopsy was then made. Under the circumstances of this case, we are satisfied the insurance company waived its right to an autopsy by failing to demand an examination of the body before the burial occurred. The policy was therefore not invalidated by a refusal to permit the autopsy since the request therefor was not made until two days after the burial occurred.

The judgment is affirmed.

Pullen, P. J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 20, 1933, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 20, 1933.